MICROSOFT CORPORATION, Plaintiff,

v.

CMOS TECHNOLOGIES, INC.; CMOS Systems, Inc.; Sushant Patnaik; Subrat Patnaik a/k/a Brad Patnaik; Satish Patel; Deepak Bajaj; Dunn's Printing Co., Inc.; Marc Dunn; G.D. Systems America, Inc.; Golden Dragon Systems, Ltd.; and Doris Ing, Defendants.

Civ. A. No. 93–2252 (AMW).

United States District Court,
D. New Jersey.

Oct. 24, 1994.

Paul G. Kelly, Brian W. Brokate, Heather J. McDonald, Beth M. Frenchman, Gibney, Anthony & Flaherty, New York City, for plaintiff.

Stephen H. Ho, Law Offices of Jimmy K. Sun, Scarborough, Ontario, Canada, for defendants.

## OPINION

WOLIN, District Judge.

This is a trademark and copyright infringement action. Plaintiff Microsoft Corporation alleges that defendants G.D. Systems America, Inc.; Golden Dragon Systems, Ltd. Canada; and Doris Ing (hereinafter "the defendants") have engaged in the distribution, offer for sale and sale of counterfeit copies of computer software programs protected by Microsoft's registered trademarks and copyrights. Before the Court is motion of plaintiff for summary judgment. Plaintiff also seeks a permanent injunction to restrain defendants from distributing, offering for sale or selling counterfeit computer software products with plaintiff's marks.[1] For the reasons expressed below, the Court will grant plaintiff's motion for summary judgment and permanently enjoin defendants. In addition, the Court will award plaintiff profits earned by the defendants from the

1. Defendants CMOS Technologies, Inc., CMOS Systems Inc, Sushant Patnaik, Subrat Patnaik a/k/a Brad Patnaik, Satish Patel, Mark Dunn, and Dunn's Printing have been dismissed from this litigation after consent judgments were entered permanently enjoining them from infringing on plaintiff's copyright and trademark rights. The only other defendant in this litigation is Deepak Bajaj; the plaintiff has requested that a default judgment be entered against him.

sale of the counterfeit software, treble profits, attorneys' fees and costs.

## I. FACTUAL BACKGROUND

### A. Microsoft Corporation

Plaintiff Microsoft Corporation ("Microsoft") is a corporation engaged in the manufacture, distribution and sale of computer software programs for personal computers. MS–DOS is a computer operating system developed and marketed by Microsoft, which is currently used on seventy million personal computers worldwide. (Amended Complaint, ¶ 17). Windows is a graphical interface computer software program developed and marketed by Microsoft, which is currently licensed for use on more than ten million personal computers worldwide. (Amended Complaint, ¶ 18). Windows is a software program which uses graphic images, or icons, to replace typed commands. (Microsoft's MS–DOS computer programs and Windows computer programs will be referred to hereinafter as "Microsoft's products".)

Microsoft has registered its copyright in its Windows and MS–DOS products with the United States Copyright Office (Amended Complaint, Exh. 1–3). Such copyrights confer on Microsoft the exclusive rights and privileges to market and distribute computer software products under the Windows brand name.

Microsoft is the owner of the federally registered trademarks "MICROSOFT" and "MS–DOS" used to identify the source of the Windows and MS–DOS products. Microsoft has registered its trademarks in the United States Patent and Trademark Office. (Amended Complaint, Exh. 4–7). As the exclusive owner of the trademarks, Microsoft has the right to enforce and sue others for infringements of its trademarks.

### B. Defendants

The defendants G.D. Systems America, Inc. and Golden Dragon Systems Ltd., Canada are in the business of distributing and selling personal computers and computer products. (Declaration of Henry Wong, filed September 14, 1994, ¶ 4, hereinafter "Wong Decl. ¶ __"; Deposition Transcript of Doris Ing at page 13, hereinafter "Ing Dep. Tr. at P. __"). Defendant Doris Ing is the field manager of G.D. Systems America Inc. and Henry Wong is the owner. *Id.* Henry Wong is also the owner of Golden Dragon Systems Ltd., Canada. *Id.* G.D. Systems owns a retail outlet for the sale of computers in Plainfield, New Jersey. *Id.* Defendants have never been licensed to sell Microsoft products.

Defendants purchased computer software products from CMOS Technologies Inc. ("CMOS"), another defendant in this action. CMOS was licensed to adapt and sell Microsoft's Windows software *in conjunction* with CMOS' computer systems. (Amended Complaint, ¶ 21). The license agreement between CMOS and Microsoft specifically prohibited the sale of "standalone" Windows software products. (*See,* License Agreement, Exh. 1 to the Declaration of Timothy Beard, filed May 25, 1993). On December 22, 1992, Microsoft terminated the license agreement with CMOS. (Beard Decl. Exh. 2).[2]

### C. Purchase and Sale of Counterfeit Software

 Despite the restrictions in the CMOS licensing agreement, defendants purchased "standalone" Windows software products from CMOS. (Ing Dep. Tr. at P. 19; Wong Decl., ¶ 3). Defendants in turn sold the counterfeit software to the public. (Declaration of Robert Holmes, dated May 21, 1993).[3] Defendants sold the counterfeit software even after they received a "Counterfeit Microsoft Products Watch List" (hereinafter

---

**2.** Microsoft terminated its license agreement with CMOS on December 22, 1992, in part, because CMOS was selling "standalone" Windows software.

**3.** The Court notes that the declaration of Robert Holmes was submitted in support of the plaintiff's motion for a preliminary injunction; not in support of plaintiff's motion for summary judg-

ment. However, in deciding a motion for summary judgment the Court may look to the entire record of the case. *Northwestern Nat. Ins. Co. v. Corley,* 503 F.2d 224 (7th Cir.1974). Moreover, plaintiff specifically incorporated this declaration by reference in its motion for summary judgment.

"Watch List") on April 6, 1993, alerting them to the possibility that the Microsoft products they were buying from CMOS "should be considered suspect as counterfeit." (Declaration of Beth Frenchman, filed September 14, 1994, ¶ 8, Wong Decl., ¶ 8–9).[4]

Robert Holmes is a private investigator who testified that on May 18, 1993, he entered the G.D. Systems store in South Plainfield, New Jersey and purchased standalone software marked "Microsoft Windows 3.1". (Holmes Decl., ¶ 5). Mr. Holmes also stated that a woman named Doris "told me that they are only suppose to sell the software at wholesale, but sold it to me anyway for $35.00 cash. Doris told me that she could not give me a receipt for the purchase, since she wasn't suppose to be selling it to me."

From September 1992 to May 1993, defendants distributed and sold 29,898 units of counterfeit software. (Frenchman Decl., ¶ 6–7). It is the sale of these "standalone" Windows software products that form the factual predicate for this action.

### D. *Procedural History*

Microsoft commenced this action on May 25, 1993, against defendants alleging copyright infringement, trademark infringement, unfair competition and dilution. Microsoft sought, among other things, *ex parte* seizure relief and a temporary restraining order. This Court granted plaintiff's seizure order and on May 27, 1992, federal marshals seized approximately 75 pieces of counterfeit software from G.D. Systems Inc.'s place of business in South Plainfield, New Jersey. On June 16, 1994, plaintiff filed its First Amended Complaint, which included Golden Dragon Systems Ltd., Canada.

On June 17, 1993, the Court entered a preliminary injunction restraining defendants from manufacturing and distributing unauthorized, pirated and counterfeit Microsoft products.

## II. *DISCUSSION*

### A. *Summary Judgment Standard*

█ Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Products Co. Inc.,* 789 F.2d 230, 232 (3d Cir.1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Whether a fact is "material" is determined by the substantive law defining the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *United States v. 225 Cartons,* 871 F.2d 409, 419 (3d Cir.1989).

█ "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *Id.*

█ If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). When the non-moving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511. *See also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 876 n. 6 (2d Cir.1986) (summary judgment appropriate in trademark infringement case).

In opposing summary judgment, a non-movant may not "rest upon mere allegations,

---

4. After receiving the Watch List, the G.D. Systems called the Microsoft Piracy Hotline and left a message. The message was never returned by Microsoft. (Wong Decl. ¶ 16–17).

general denials, or ... vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.), *cert. denied*, 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990) ("unsupported allegations in [a non-movant's] memorandum and pleadings are insufficient to repel summary judgment"); *see* Fed.R.Civ.P. 56(e). The summary judgment procedure enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990).

■ An affidavit filed in opposition to a properly-supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A non-movant "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 888, 110 S.Ct. at 3188. The Court is not to presume the existence of specific facts from general averments. *Id.* Such an affidavit must: (1) "show affirmatively that the affiant is competent to testify to the matters stated therein"; (2) be based on "personal knowledge"; and (3) establish facts that "would be admissible at trial". Fed.R.Civ.P. 56(e); *see Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 282 (3d Cir.1988). In sum, an affidavit offered in opposition to a motion for summary judgment must establish a proper evidentiary foundation for the facts stated within it. *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 471 (3d Cir.1989) (Garth, J., concurring). Affidavits that fail to satisfy these requirements "may not be considered" on a motion for summary judgment. *Hlinka*, 863 F.2d at 282–83. Moreover, "[w]hen, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists." *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991); *see also Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703 (3d Cir.1988).

**B. *Undisputed Facts Warrant Summary Judgment***

■ In this case, the defendants have failed to point to any material issue of fact that would warrant a trial on the issues of infringement or damages. In fact, defendants only opposition to the motion for summary judgment is the eight-page affidavit of Mr. Wong. Mr. Wong in his affidavit does not assert that this case is inappropriate for disposition by summary judgment.

The affidavit of Mr. Wong fails to raise a material issue of fact for trial for several reasons. First, that affidavit contains nothing more than "conclusory allegations" *Lujan*, 497 U.S. at 888, 110 S.Ct. at 3188. The Court is not to presume the existence of specific facts from general averments. *Id.* As such, the Wong affidavit does not create any material issues of fact for trial. *Hlinka*, 863 F.2d at 282–83.

Moreover, many of the allegations in the Wong affidavit were contradicted by Mr. Wong's deposition testimony. For example, Mr. Wong's statements in his affidavit in which he describes the meaning of certain invoices from CMOS (Wong Decl. ¶ 6, 13, 14, and 15) are in contradiction to his deposition testimony in which he said he had no understanding of the CMOS invoices. (Wong Dep. Tr. at 43). "When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists." *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991); *see also Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703 (3d Cir.1988).

Finally, the Wong affidavit fails to raise a material issue of fact for trial because the affidavit fails to dispute any of the following material facts:

1. Defendants distributed, offered for sale and sold counterfeit Microsoft computer software products to the public.

2. Defendants made these sales after they were notified on April 6, 1993, that products they were purchasing from

CMOS should be considered "suspect" as being counterfeit.

Because these facts are undisputed the Court finds summary judgment on the issues of infringement and damages is appropriate.

## C. *Federal Trademark Infringement*

■ "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Interpace Corp. v. Lapp Inc.*, 721 F.2d 460, 462 (3d Cir.1983). *See, Ford Motor Co. v. Summit Motor Products Inc.*, 930 F.2d 277, 291–93 (3d Cir.), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991), and authorities cited therein; *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228–29 (3d Cir. 1978). To succeed on a trademark claim, a plaintiff must establish that (1) the mark is valid and legally protectable; (2) plaintiff owns the mark and; (3) defendant's use of the mark to identify goods or services is likely to create confusion about the origin of the goods or services. *Ford Motor Co.*, 930 F.2d at 291. (citing *Optician Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 192 (3d Cir.1990)). *See also Pedi–Care, Inc. v. Pedi–A–Care Nursing, Inc.*, 656 F.Supp. 449, 453 (D.N.J.1987); *Holiday Inns, Inc. v. Trump*, 617 F.Supp. 1443, 1464 (D.N.J.1985).

■ "The first two requirements, validity and legal protectability, are proven where, as here, a mark was federally registered and has become 'incontestable' under the Lanham Act, 15 U.S.C. §§ 1058 and 1065." *Fisons Horticulture Inc. v. Vigoro Industries Inc.*, 30 F.3d 466, 472 (3d Cir.1994). It is undisputed that Microsoft owns the federally registered trademarks for the MS–DOS and Windows names and that Microsoft's federally-registered marks are legally protectable. Thus, Microsoft has satisfied the first two elements of federal trademark infringement. Therefore, the Court will examine the third element: likelihood of confusion.

■ A myriad of factors may be considered in determining whether a likelihood of confusion exists, including:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods ... are marketed through the same channels of trade and marketed through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Ford Motor Co.*, 930 F.2d at 293; *Scott Paper Co.*, 589 F.2d at 1229; *CPC Intern., Inc. v. Caribe Food Distributors*, 731 F.Supp. 660, 664–65 (D.N.J.1990). "Proof of actual confusion is not necessary; likelihood of confusion is all that need be shown." *Ford Motor Co.*, 930 F.2d at 292.

The Third Circuit has explained that when the trademark owner and the alleged infringer are in direct competition, it is rarely necessary to look beyond the mark itself to decide if there has been an infringement. *Fisons Horticulture*, 30 F.3d at 472. When the litigants are in direct competition "[t]he court focuses on the marks to determine whether they are 'confusingly similar.'" *Id.* (citing, *Country Floors Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1063 (3d Cir.1991).

It would be difficult to imagine a clearer case of consumer confusion than the instant case in which the defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's registered marks appear in their entirety. Under these circumstances, the likelihood of consumer confusion, mistake or deception is clear. Therefore, this Court finds that the defen-

dants are in violation of 15 U.S.C. § 1114(1) [5] and § 1125(a) [6].

### D. *Copyright Infringement*

[12] Copyright infringement is established by proving two elements: (1) plaintiff's ownership of the copyright and (2) unauthorized distribution of "copies or phonorecords of the copyrighted work to the public by sale or transfer." 17 U.S.C. § 106(3).

It is undisputed the plaintiff is the owner of the copyright to the names "MS–DOS" and "Windows" for computer products. It is also undisputed that defendants engaged in the unauthorized distribution of counterfeit Microsoft products bearing the names "MS–DOS" and "Windows." Therefore, the Court finds that the defendants have committed copyright infringement under 17 U.S.C. § 106(3).

### E. *Damages*

#### 1. Permanent Injunction

Plaintiff asks this Court to permanently enjoin defendants from selling computer software products with the MS–DOS and Windows marks. 15 U.S.C. § 1116(a) provides, in part:

The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to principles of equity an upon

such terms as the court may deem reasonable to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office.

A permanent injunction, in accordance with 15 U.S.C. § 1116 is proper "only when there is a likelihood not only that customers could have been misled in the past, but that customers will be misled in the future." *Weight Watchers Intern. Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1288 (S.D.N.Y.1990); *Larsen v. Ortega*, 816 F.Supp. 97 (D.Conn. 1992). Such is the case here. Customers entering defendants' stores will be misled into thinking defendants are licensed distributors of Microsoft products. Accordingly, a permanent injunction shall ensue barring defendants from selling products with the plaintiff's marks.[7]

#### 2. Lost Profits

Plaintiff seeks to recover the defendants profits. Section 1117(a) of the Lanham Act, states:

When a violation of any right of the registrant or a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 and subject to the principles of equity, (1) defendants profits, (2) any damages

---

5. Section 32 of the Lanham Act, 15 U.S.C. § 1114 (1988 and Supp. IV 1992) protects registered trademarks and provides in part:

(1) Any person who shall, without the consent of the registrant—
(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or cause mistake or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

6. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (1988 and Supp. IV 1992), which provides protection for both registered and unregistered marks, states, in part:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term,

name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

7. Because this Court awards a permanent injunction for trademark infringement it need not address whether injunctive relief is also appropriate as a result of defendants acts of copyright infringement pursuant to 17 U.S.C. § 502.

sustained by the plaintiff, and (3) costs of the action.

Because plaintiff has proven that defendants violated its trademarks, plaintiff argues it is entitled to relief under § 1117(a) of the Lanham Act.

■ However, under the express language of § 1117, an accounting of profits is not automatic and is granted in light of equitable considerations. The Third Circuit repeatedly has held that an accounting will be denied where an injunction forbidding future infringing acts satisfies the equities of the case. *National Dryer Mfg. Corp. v. National Drying Mach. Co.,* 228 F.2d 349 (3d Cir. 1955), *cert. denied,* 351 U.S. 906, 76 S.Ct. 694, 696, 100 L.Ed. 1442 (1956); *Taussig v. Wellington Fund Inc.,* 313 F.2d 472 (3d Cir.), *cert. denied* 374 U.S. 806, 83 S.Ct. 1693, 10 L.Ed.2d 1031 (1963); *Morgenstern Chemical Co. v. G.D. Searle & Co.,* 253 F.2d 390 (3d Cir.), *cert. denied,* 358 U.S. 816, 79 S.Ct. 25, 3 L.Ed.2d 58 (1958).

Each of the Third Circuit cases limiting recovery to injunctive relief is distinguishable from the present case. In *National Dryer,* the Court found the plaintiff had failed to prove any damages as a result of the infringement. In *Taussig,* the Court found there was no evidence that defendant made any profits. And, in *Morgenstern,* the Court found that the defendants products did not compete with the plaintiff's products. Because these cases are factually different from the instant case, the Court does not feel it is bound to follow the teaching of these cases. The Court, instead, will analyze whether in the present case the plaintiff has met its burden of proof on the issue of profits.

■ In *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 131, 67 S.Ct. 1136, 1139, 91 L.Ed. 1386 (1947), the Supreme Court held that profits and damages may be awarded in cases where the infringement is "willfully calculated to exploit the advantage of an established mark." Therefore, "it is necessary to show not only that the infringer infringed, but that he did so with the intent to cause confusion, mistake or deceive purchasers; in other words, to purposely palm off the infringer's goods as those of the infringed." *Carl Zeiss Stiftung v. V.E.B. Carl*

*Zeiss Jena,* 433 F.2d 686, 707 (2d Cir.1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). And, the Third Circuit held "the propriety of an accounting depends upon whether [the infringer's] use was in good faith and whether it was palming off." *Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1407 (3d Cir.), *cert. denied,* 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985). Thus, without a showing of fraudulent conduct, palming off or deliberate intent to confuse on the part of the infringer to cause confusion, there is no justification for an accounting of the infringer's profits.

In this case, the record clearly supports a finding that defendants infringement was deliberate and with the intent to deceive the public. The defendants sold counterfeit Microsoft products with the intent of deceiving the public into believing they were buying genuine Microsoft products. Evidence that defendants acted intentionally is shown by the fact that defendants sold counterfeit products after receiving the Microsoft "Watch List" on April 6, 1993. Moreover, Doris Ing clearly knew she wasn't suppose to be selling the counterfeit Microsoft products, as evidenced by her statement to investigator Holmes that she could not provide a receipt since she wasn't suppose to be selling him the software. (Holmes Decl. ¶ 5). Because the Court finds the conduct of the defendants was "willfully calculated to exploit the advantage of an established mark" it will award profits. *Champion Spark Plug,* 331 U.S. at 131, 67 S.Ct. at 1139.

### 3. Time Period for Accounting

■ In this case, plaintiff offers the declaration of Beth M. Frenchmen, which reveals that defendants purchased approximately 29,898 units of counterfeit Microsoft products from CMOS Technologies from September 17, 1992, to May 19, 1993. (Frenchman Decl., ¶ 5–7). Ms. Frenchman also attests that the average purchase price of the counterfeit products was $25.00 per unit. *Id.* at ¶ 4. Finally, plaintiff offers the declaration of Robert Holmes to support a finding that defendant G.D. Systems sold each unit to the public for $35. (Holmes

Decl., ¶ 5). Thus, G.D. Systems made a profit of $10 per unit. Therefore, plaintiff seeks to recover $298,980 in profits. Defendants counter that they could not have known the software they were purchasing from CMOS was counterfeit until, at the earliest, April 6, 1993, when they received the Microsoft "Watch Letter." (Wong Decl. ¶ 9). Defendants also argue that until Microsoft terminated its contract with CMOS on December 22, 1992, the purchase of Microsoft products from CMOS was legitimate. (Wong Decl. ¶ 11). Defendants argue it would be "commercially unreasonable" to require them to know that the terms of the CMOS contract with Microsoft prohibited the sale of "standalone" computer products. (Wong Decl. ¶ 11).

At the very least, the Court finds the evidence in this case supports the conclusion that defendants clearly knew they were selling counterfeit products on May 18, 1993, when Doris Ing told investigator Holmes "they are only suppose to sell the software at wholesale," and that "she could not give [Mr. Holmes] a receipt for the purchase, since she wasn't suppose to be selling it [to him]." (Holmes Decl. ¶ 5.)

The Court also finds the evidence in this case supports the conclusion that the defendants were aware that the Microsoft products they were purchasing from CMOS were counterfeit on April 6, 1993, when they received the "Watch List" from Microsoft. In fact, defendants concede the "Watch List" made them aware they were purchasing counterfeit products from CMOS. In his declaration, Mr. Wong states: "Prior to and until receiving the Watch List, G.D. Systems had no knowledge of and had no reason to suspect CMOS Technologies' alleged counterfeiting and other related activities." (Wong Decl. ¶ 9).

The question that must be resolved is whether plaintiff is entitled to recover all of defendants profits from the sale of Microsoft products purchased from CMOS or only those products sold after April 6, 1993.

There is no Third Circuit case law to guide the Court in determining what period of time profits should be awarded. In *Francis H. Leggett & Co. v. Premier Packing Co. Inc.*, 140 F.Supp. 328 (D.Mass.1956), the District Court found the defendant violated plaintiff's trademark rights under the Lanham Act by its use of the word "Premier" to identify its meat products. The court issued an injunction and awarded the plaintiff profits. However, the court restricted the time period for which the defendant had to disgorge its profits to profits earned after June 1, 1954, the time when the defendant first learned that its use of the word "Premier" violated plaintiff's trademark.

The Court finds the reasoning of *Leggett* persuasive. In the present case there is no evidence that defendants were aware the products they were purchasing from CMOS were counterfeit until they received a "Watch List" from Microsoft on April 6, 1993, alerting them to the possibility that they were buying counterfeit software from CMOS. (Wong Decl., ¶ 8–9).[8] Therefore, this Court will order defendants to disgorge all profits from the sale of Microsoft products after April 6, 1993.

### 4. Burden of Proof

Because the record is unclear as to how much profits the defendants earned from the sale of counterfeit Microsoft products after April 6, 1993, the Court will ask Magistrate Joel Pisano to hold whatever proceedings he believes necessary, and then report and recommend to this Court an appropriate award for profits.

 At the proceedings before Judge Pisano, the plaintiff will bear the burden of proving defendants' sales. The burden will then shift to the defendants either to prove they did not earn any profits from their sale of counterfeit Microsoft products or to offset their profits with costs. This requirement is expressly set forth in 15 U.S.C. § 1117, which states: "In assessing profits the plaintiff shall be required to prove defendant's sale only; defendant must prove all elements

---

**8.** The Court finds Ms. Ing's testimony indicating that the purchase price from CMOS was low is

inconclusive.

of costs or deduction claimed." In *William-son–Dickie Mfg. Co. v. Davis Mfg. Co.*, 251 F.2d 924 (3d Cir.1958), the Third Circuit upheld an award of profits where the defendant's products were found to be in direct competition with the plaintiff, as is true in the present case. The Court held: "The infringement having been proved, and the competitive sales of defendants' goods bearing the infringing mark having been shown, the burden is then upon defendants to demonstrate, if they can, that profits were not derived from the infringing use." *Id.* at 927. Thus, the defendants in this case have the burden of showing that either there was no profit attributable to their sale of counterfeit products or that there are costs that should offset profits.

### 5. Treble Profits

Plaintiff seeks to recover treble profits as a result of what it characterizes as defendants "willful blindness" to the counterfeit nature of the products they were buying from CMOS. Defendants counter they should not be held liable for treble profits because they were "innocent purchasers" who believed they were buying legitimate Microsoft products from a licensed distributor.

The language of the Lanham Act permits the Court to award treble profits in cases of willful infringement, 15 U.S.C. § 1117(a) states: "In assessing damages, the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." More importantly, the Lanham Act was amended in 1984 to make the award of treble damages mandatory in cases where the Court finds the defendant has committed intentional distribution, offer for sale or sale of counterfeit goods. The new § 1117(b) states:

In assessing damages under subsection (a) of this section, the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with reasonable attorneys' fees, in the case

of any violation of section 1114(1)(a) of this title or section 380 of Title 36 that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale or distribution of goods or services.

Several courts have interpreted the Lanham Act in light of the 1984 amendment to mandate the award of treble damages in all cases of intentional infringement. For example, in *Fendi S.A.S. Di Paola Fendi E Sorelle v. Cosmetic World Ltd.*, 642 F.Supp. 1143, 1147 (S.D.N.Y.1986) the court held: "Under the amended Lanham Trade–Mark Act, absent 'extenuating circumstances,' federal courts are expected, not merely authorized, to enter judgment for three times such profits or damages, whichever is greater, together with reasonable attorneys' fees for intentional use of trademark knowing it to be counterfeit." *See also, Chanel Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1475 (11th Cir. 1991); ("If the infringement is intentional ... § 1117 governs: unless the court finds extenuating circumstances treble damages and attorneys' fees are mandated.").

What constitutes an extenuating circumstance is determined on a case by case basis. Where the defendant is an "unsophisticated individual, operating on a small scale, for whom the imposition of treble damages would mean that he or she would be unable to support his or her family" treble damages may be inappropriate. Joint Explanatory Statement, 130 Cong.Rec.H. 12,076 at 12,083 (Oct. 10, 1984). However, Congress has indicated that "it will be a rare case in which a defendant who has trafficked in goods or services using a mark that he or she knows to be counterfeit can show that he or she should not be assessed treble damages." *Id.*

In this case, we find no extenuating circumstances that bar the imposition of treble profits. Defendants are not individuals who will face hardship as a result of this award. Rather, defendants are commercial retailers in the business of selling computers and computer software.[9] They made the

---

9. Although Defendant Doris Ing, is an employee of G.D. Systems, and not a corporate entity, the

decision to sell counterfeit Microsoft products even after they received the "Watch List" on April 6, 1993. Therefore, it can be said that defendants acted intentionally in trafficking in goods or services using a mark they knew to be counterfeit. As such, this Court finds it appropriate to award plaintiff treble profits.

Even if this Court did not find that defendants acts were intentional, plaintiff offers several cases to support the proposition that "willful blindness" can be the basis for an award of treble profits. *Chanel,* 931 F.2d 1472 (*infra*); *Louis Vuitton S.A. v. Lee,* 875 F.2d 584 (7th Cir.1989), *Levi Strauss & Co. v. Diaz,* 778 F.Supp. 1206 (S.D.Fla.1991).

This Court finds the facts of *Louis Vuitton,* 875 F.2d 584, are remarkably similar to the instant case. In *Louis Vuitton* the French manufacturer of swank luggage and handbags sought an injunction and damages as a result of the sale of counterfeit Louis Vuitton products by defendants Mr. and Mrs. Lee from their store, K–Econo Merchandise, which carried "an eclectic, even ragtag, selection of merchandise." *Id.* at 586. As in the present case, Louis Vuitton hired a private investigator who was able to purchase counterfeit goods from the defendants. And, as in the present case, the defendants admitted they sold counterfeit goods but argued they were "innocent" infringers.

The Circuit Court reversed the trial court, which failed to award plaintiff profits and treble damages. Judge Posner, writing for the majority, held:

> As Congress well knew in beefing up the legal sanctions for counterfeiting trademarks in 1984 (even to the extent of making trafficking in counterfeit trademarks a crime, see 18 U.S.C. § 2320) and as is anyway obvious to even a casual consumer, the sale of counterfeit merchandise has become endemic—perhaps pandemic. See S.Rep. No. 526 at 2–6. Most of the infringing sellers are small retailers such as K–Econo. Obtaining an injunction against each and every one of them would be infeasible. Trademark owners cannot hire investigators to shop at every retail store

> in the nation. And even if they could and did, and obtained injunctions against all present violators, this would not stop the counterfeiting. Other infringers would spring up, and would continue infringing until enjoined. To stop counterfeiting, a trademark owner must be able to invoke section 1117(b), the treble-damage (alternatively, at the plaintiff's option, treble-profit) provision that Congress added to the trademark law in 1984. Treble damages are a particularly suitable remedy in cases where surreptitious violations are possible, for in such cases simple damages (or profits) will underdeter; the violator will know that he won't be caught every time, and merely confiscating his profits in the cases in which he is caught will leave him with a net profit from infringement. From this we can see that the disparity in size between the typical owner of a trademark on fashionable goods and the typical seller of counterfeits of those trademarked goods is no reason to deny monetary relief to the former; for the smaller the violator, the less likely he is to be caught, and the more needful therefore is a heavy punishment if he is caught.

*Id.* at 588. Judge Posner added that although a finding of "knowing" counterfeiting is sufficient to sustain an award for treble damages, "willful blindness" also can support an award for treble damages. *Id.* at 590. Indeed, the Joint Statement on Trademark Counterfeiting Legislation, 130 Cong.Rec. at H12076–77 states: "[I]f the prosecution proves that the defendant was 'willfully blind' to the counterfeit nature of the mark, it will have met its burden of showing 'knowledge.'"

This Court finds the reasoning of *Louis Vuitton* persuasive. Because the evidence in this case supports a conclusion that after April 6, 1993, the defendants sale of counterfeit Microsoft products was done "intentionally" or at the very least with "willful blindness," it will award plaintiff treble profits. The fact that defendants are smaller retailers does not create an "extenuating circumstance" that mitigates against the award of

evidence clearly supports a finding that she acted intentionally in the sale of counterfeit Microsoft

products. As such, the Court finds it appropriate to include her in the treble profits award.

treble profits. As Judge Posner held: "Equity is not a roving commission to redistribute wealth from large companies to small ones. The Lanham Act was not written by Robin Hood." *Id.* at 589.

### 6. Attorneys' Fees

■■■ Plaintiff seeks to recover its attorneys' fees. 15 U.S.C. § 1117 provides that "the Court in exceptional cases may award reasonable attorneys' fees to the prevailing party." "The Senate Report stated that attorneys' fees should be awarded where the infringing act 'can be characterized as malicious,' 'fraudulent,' 'deliberate' or 'willful.'" *Ferrero U.S.A. Inc. v. Ozak Trading Inc.,* 952 F.2d 44, 47 (3d Cir.1991) (quoting S.Rep. No. 1400, 93d Cong., 2d Sess. 2 1974, U.S.Code Cong. & Admin.News 1974 at pp. 7132, 7133)). In *Ferrero,* the Third Circuit held that "a district court must make a finding of culpable conduct on the part of the losing party, such as bad faith, fraud, malice, or knowing infringement, before a case qualifies as 'exceptional'." *Id.* (citations omitted). Also, as discussed *infra,* § 1117(b) provides that the court shall award attorneys' fees in cases where the defendant is found to have intentionally sold counterfeit goods in violation of § 1114.

As discussed *infra,* the evidence in this case supports the conclusion that the defendants infringement in violation of § 1114 was "knowing" and "willful." Therefore, this Court will award plaintiff its attorneys' fees.

Plaintiff has submitted the Declaration of Brian W. Brokate in support of its application for attorneys' fees. The defendants do not offer any opposition to the facts set forth in the Brokate Declaration. Therefore, this Court will award plaintiff $88,780.00 as reasonable attorneys' fees, as detailed in the Brokate Declaration.

### 7. Costs

■■■ The general rule in trademark cases is that a decree finding defendants have committed intentional infringement carries costs. *Sawyer v. Kellogg,* 9 F..601 (C.C.N.J.1881). As a result, the Court will award plaintiff its costs. Costs will determined by the Clerk of the Court in accordance with the United States District Court rules.

### CONCLUSION

For the foregoing reasons, this Court will enter a permanent injunction against defendants, their agents, servants, employees, attorneys, confederates and all persons acting for with, by, through, or under them from distributing, offering for sale or selling any products bearing the plaintiff's marks "MS–DOS" or "Windows." In addition, this Court will award plaintiff all profits earned by the defendants from their sale of counterfeit Microsoft products after April 6, 1993, as well as treble profits, $88,780.00 in attorneys' fees and costs.

### ORDER

This matter coming before the Court on plaintiff's motion for summary judgment and the Court having considered the same on the papers submitted, without oral argument, pursuant to Fed.R.Civ.P. 78, and for the reasons expressed in this Court's Opinion dated October 24, 1994,

· It is on this 24th day of October, 1994

ORDERED that plaintiff's motion for summary judgment is hereby granted, and it is further

ORDERED that defendants, their agents, servants, employees, attorneys, confederates and all persons acting for with, by, through, or under them are permanently enjoined from distributing, offering for sale or selling any products bearing the plaintiff's marks "MS–DOS" or "Windows," and it is further

ORDERED that defendant will pay plaintiff all profits earned by the defendants from their sale of counterfeit Microsoft products after April 6, 1993, as well as treble profits, $88,780.00 in attorneys' fees and costs.