**MICROSOFT CORPORATION, Plaintiff,**

v.

**GREY COMPUTER, et al., Defendants.**

**Civ. A. No. AW 94–221.**

United States District Court,
D. Maryland,
Southern Division.

Dec. 21, 1995.

Thomas Nicholas Tartaro, Preston, Gates, Ellis & Rouvelas Meeds, Washington, DC, Jane H. Barrett, Preston, Gates & Ellis, Los Angeles, CA, for plaintiff Microsoft Corp.

George Z. Petros, Annapolis, MD, for defendants Grey Computer, Inc., a Maryland Corporation, Adieba Hijazi, Bilal Hijazi aka Bilel Hijazi, Husim Hijazi, Integrated Computers Electronic, Inc., a Maryland Corporation, Hiatham Hijazi.

### *MEMORANDUM OPINION*

WILLIAMS, District Judge.

Microsoft Corporation ("Microsoft") instituted this civil action against Grey Computer, Inc. ("Grey"), Integrated Computer Electronic, Inc. ("ICE"), Intelligent Data Systems ("IDS") and their respective principals.[1] Microsoft claims that Defendants infringed upon their copyrights and trademarks by selling or distributing counterfeit copies of Microsoft's software products.

After discovery, Microsoft moved for summary judgment on issues of liability and damages against Direct Wholesale, Dewitt Williams and Timothy Mazoch (collectively "Defendants"). It also seeks a permanent injunction to prevent Defendants from further distributing, offering for sale or selling counterfeit computer software bearing Microsoft's marks. ICE, a third-party plaintiff, also moved for summary judgment on issues of liability and damages against the Defendants and against Williams and Mazoch, individually. The Court has jurisdiction under

---

**1.** Microsoft sued Adieba Hijazi, Bilal Hijazi (aka Bilel Hijazi), Husim Hijazi, Nasser Faraj, Hiat-ham Hijazi (aka Haitham Hijazi) and Fiafal Masri in their individual capacities.

28 U.S.C. §§ 1331, 1332, 1338 and the doctrine of pendent jurisdiction.

## I.

Microsoft is the worldwide leader in computer software. It offers a wide range of products and services for businesses and personal use, each designed with the mission of making it easier and more enjoyable for people to take advantage of the full power of personal computing every day. Microsoft is the owner of valid and incontestible registered trademarks in and to "Microsoft" and "MS–DOS" for use in connection with computer software.[2] It is the owner of registered copyrights in and to all MS–DOS 5.0, 6.0 and 6.2 software products, including User's Reference Manuals and User's Guides and Screen Displays ("Windows Software Products"). Microsoft has caused it trademarks to be registered in the United States Patent and Trademark Office on the Principal Register.

Direct Wholesale opened for business in February 1993. Mazoch and Williams are equal and sole shareholders. Ninety to ninety-five percent of Direct Wholesale's business was in distributing software products. While almost all of the software products Direct Wholesale distributed were Microsoft products, Microsoft has never licensed Direct Wholesale, Timothy Mazoch or Dewitt Williams to manufacture, replicate, distribute, market or advertise any MS–DOS or Windows Software Product, manuals, or packaging.

During it operations, Direct Wholesale received at least two news releases regarding Microsoft software. The releases provided:

Microsoft has alleged that Micro Innovation, Inc. of Houston, also known as MIC, was producing unlicensed MS–DOS 5 and Windows 3.1 under its own tradename, and distributing its product throughout the PC Innovations stores and other resellers nationally. Simultaneously seizures at seven Houston-area locations netted 35,000 units of MS–DOS and Windows, with a street value of approximately $2 million.

Microsoft legally licenses MS–DOS and Windows to computer manufacturers to include with their PCs for sale. However, Microsoft's license agreements prohibit the sale and/or distribution of Microsoft's products by themselves, without an accompanying PC.... Any consumers or resellers having questions about the legitimacy of Microsoft products should contact the Microsoft piracy hotline at (800) NO–COPYN.

Despite having received notice of Microsoft's prohibition of selling its software without an accompanying PC, Direct Wholesale continued to buy purported Microsoft software products from its California suppliers without accompanying PCs.

Direct Wholesale then sold the software to companies like ICE. From 23 July 1993 through 27 December 1993, ICE paid Direct Wholesale $195,773.63 for the purported Microsoft software to use in its PC sales. Direct Wholesale represented to ICE that it had good and merchantable title. Direct Wholesale also represented that it was an authorized distributor of Microsoft products.

On 31 January 1994, Microsoft commenced this action by filing its Complaint against Grey Computer, ICE and their respective principals, among others. In its original complaint Microsoft alleged copyright infringement, trademark infringement, false designation of origin and unfair competition arising out of the Defendants' purported sale of counterfeit copies of Microsoft's software products. On 1 February 1994, Microsoft personnel accompanied the U.S. Marshal Service as it executed a Writ of Seizure and Impound issued by this Court against Grey and ICE. Consequently, Microsoft obtained information indicating that Grey and ICE were involved in unauthorized distribution of counterfeit versions of Microsoft MS–DOS and Windows software products. Such information included a recently arrived shipment of approximately 1,000 units of alleged counterfeit Microsoft software products from Direct Wholesale. The information also includ-

---

**2.** MS–DOS is a computer operating system while Microsoft Windows is a graphical interface computer software program.

ed business records of Grey and ICE which confirmed that Direct Wholesale was the source of supply for the seized units of unauthorized Microsoft software products.

On 2 February 1994, Microsoft filed its First Amended Complaint adding Direct Wholesale as a party defendant and obtained a Supplemental Writ of Seizure and Impound against Direct Wholesale. On 4 February 1994, the U.S. Marshal, accompanied by Microsoft's attorneys, seized a box of eighteen diskettes containing Microsoft Windows software and along with various business records from Direct Wholesale. The records suggested that Direct Wholesale distributed counterfeit Microsoft software products nationally, as well as to Grey and ICE. The records, some of which were cryptically coded, also indicated that Direct Wholesale purchased and distributed unauthorized Microsoft software products in an unusual and suspicious manner. The seizures eventually revealed that Direct Wholesale purchased and distributed approximately 45,848 units of counterfeit Microsoft software products. Thereafter Microsoft filed another amended complaint adding Direct Wholesale's sole shareholders and officers, Dewitt Williams and Timothy Mazoch, as party defendants.

Microsoft subsequently examined about 1,000 units of the seized software. The examination confirmed Microsoft's suspicions that the software products were unauthorized and counterfeit reproductions of Microsoft software products. ICE and Grey, among others, filed crossclaims and a third-party complaint against Direct Wholesale. Microsoft settled its dispute with ICE, Grey, Adieba Hijazi, Bilal Hijazi, Hiatham Hijazi, Husim Hijazi, Intelligent Data Systems, Inc. and Nasser Faraj. Accordingly, the Court entered separate stipulated permanent injunctions against each of these defendants.

Based on information it gathered during the seizures and other relevant information, Microsoft moved for summary judgment against Direct Wholesale, Williams and Mazoch on its claims of copyright and trade-

mark infringement, unauthorized distribution, false designation of origin and unfair competition. On 25 September 1995, the Court heard oral argument regarding Microsoft's and ICE's motions for summary judgment.[3] Despite notice, Defendants chose not to attend the hearing. For the reasons set forth more fully below the Court will issue a written order granting Microsoft's and ICE's motions for summary judgment as to their third-party complaint. The Court will also grant Microsoft's request for a permanent injunction and will order the impounded counterfeit software products delivered to Microsoft for destruction.

## II.

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of demonstrating the absence of any factual issues. While the Court must construe all facts and reasonable inferences drawn therefrom in the non-movant's favor, the mere existence of a scintilla of evidence will not defeat a motion for summary judgment. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The opposing party must provide the Court with specific facts establishing a genuine issue for trial. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. For the reasons set forth below and in open court on the record, the Court will issue an order granting both motions for summary judgment.

## III.

Microsoft urges that this is a clear cut case of copyright and trademark infringement. Microsoft alleges Defendants distributed counterfeit goods, bearing Microsoft's marks. Microsoft asserts that Defendants distribut-

3. The Court granted both motions for summary judgment during the hearing. The Court will not further address the ICE motion in this memorandum as many of the issues are overlapping. Rather, the Court will reserve further comment after ICE has submitted its application for attorneys' fees and cost.

ed poor quality copies of its copyrighted works and deceived consumers.

Defendants urge that they were innocent infringers. Williams and Mazoch posit that they conducted Direct Wholesale's business according to the practices and procedures they learned while working as salesmen/brokers in the computer software field.

## A. Copyright Infringement

To establish copyright infringement Microsoft had to show that it owned the copyrights at issue and that Defendants "encroached upon one of the exclusive rights [they] conferred." *Avtec Systems, Inc. v. Peiffer,* 21 F.3d 568, 571 (4th Cir.1994) (citing 17 U.S.C. § 501(a); *Trandes Corp. v. Guy F. Atkinson Co.,* 996 F.2d 655, 660 (4th Cir.) *cert. denied,* —— U.S. ——, 114 S.Ct. 443, 126 L.Ed.2d 377 (1993)). Three of those rights are at issue in this case, Microsoft's right to: (1) reproduce its software products in copies or phonorecords; (2) prepare derivative works based upon the copyrighted work; and (3) distribute copies or phonorecords of its software products to the public by sale or other transfer of ownership, or by lease, or lending. *See* 17 U.S.C. § 106(1)–(3).

■ Section § 106 vests the copyright owner with the exclusive right to reproduce, *distribute copies of and to prepare derivative works based upon the copyrighted work.* 17 U.S.C. § 106(1)–(3). Violation of any of the rights granted under § 106 constitutes infringement. *See Buck v. Jewell,* 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971 (1931). Moreover, neither lack of knowledge nor intent are defenses to a claim of copyright infringement. *Id.; Fitzgerald Publishing Co. v. Baylor Publishing Co.,* 807 F.2d 1110, 1113 (2d Cir.1986) ("innocent infringer" is nevertheless an infringer); *see also Bourne v. Fouche,* 238 F.Supp. 745 (E.D.S.C.1965). Rather, knowledge and intent are factors for the Court to consider in determining whether to award statutory damages and attorneys fees.

### 1. Ownership

Defendants do not dispute that Microsoft is the owner of all of the software products at issue. Nor do Defendants dispute that the registrations are valid and incontestable. Here, the Court is entitled to and will rely upon the registrations as proof of Microsoft's ownership. *See Johnson Controls, Inc. v. Phoenix Control Systems, Inc.,* 886 F.2d 1173 (9th Cir.1989).

■ Copyright registration certificates are *prima facie* evidence of a plaintiff's ownership of valid copyrights. *See* 17 U.S.C. § 401(c); *Service & Training, Inc. v. Data General Corp.,* 963 F.2d 680 (4th Cir.1992); *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 434 (4th Cir.1986); *Montgomery County Association of Realtors, Inc. v. Realty Photo Master Corp.,* 878 F.Supp. 804, 809 (D.Md. 1995) ("certificate . . . constitutes prima facie evidence of the validity of the certificate and the facts stated [therein]."). Microsoft has provided the Court with evidence showing that the copyrights in all of the Microsoft products involved were registered with the United States Copyright Office in compliance with the Copyright Revision Act of 1976 and regulations flowing therefrom. *See* 17 U.S.C. § 101, *et seq.* Microsoft has valid Certificates of Registration for all of its software products. Moreover, it has been and still is the sole owner of all right, title and interest in, and to, the relevant copyrights and Certificates of Registration.

### 2. Copying

■ According to Microsoft, Defendants were involved in extensive copying of Microsoft's software products. "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights, described at 17 U.S.C. § 106." *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1085 n. 3 (9th Cir.1989). Defendants do not dispute that they were involved in copying Microsoft's software products. Defendants Williams and Mazoch admit that from November 1993 through January 1994, ninety to ninety-five percent of their business involved the distribution of software products. While Williams and Mazoch claim that only eighty-five to ninety percent of their software sales involved the distribution of Microsoft software products, the invoices seized from Direct Wholesale indicate that nearly all of its busi-

ness involved the distribution of counterfeit Microsoft software products during that time period.

Defendants argue that they did not intentionally copy Microsoft's products. They posit that they had never seen and had no knowledge of Microsoft's prerequisite licensing practices or of any of the limitations Microsoft imposed upon product distribution. This argument is incredulous.

There is no dispute that Williams and Mazoch received the news releases regarding the sale of Microsoft's software products and the restrictions. Williams and Mazoch are experienced computer software professionals with experience in the software industry dating back to 1989. They both had enough business savvy to engage in a successful, albeit, illegal business venture. Moreover, even assuming, *arguendo*, that they had no knowledge of Microsoft's licensing practices, knowledge is not an element of copyright infringement. *See Buck*, 283 U.S. at 191, 51 S.Ct. at 410.

Defendants next urge that "[s]urely at some point in the distribution chain Microsoft no longer can inhibit sale of computer products." (Opposition, p. 6). This argument also lacks merit. Unlike contracts, copyrights and the rights flowing therefrom are entirely creatures of statute and "computer programs [are] proper subjects of copyright." *M. Kramer Mfg. Co.*, 783 F.2d at 432. By the clear terms of § 106, Microsoft, as owner of the copyrighted works, has the exclusive right to limit the distribution chain of its products. *See Radji v. Khakbaz*, 607 F.Supp. 1296 (D.C.Cir.1985). Limitations on those rights, none of which Defendants raise, are properly contained in the Copyright Act itself under §§ 107–118.

Finally, Defendants urge that Microsoft has only presented circumstantial evidence of copying. Defendants contend that there is no factual basis for Microsoft's conclusion that the various units of software it examined "appeared identical" to Microsoft's software products. They further contend that when Microsoft seized the software shipment from ICE, it had no way of knowing if the boxes had been previously opened or unsealed. Thus, according to Defendants, Microsoft had no way of knowing if the boxes had been tampered with after leaving Direct Wholesale.

Microsoft counters that the facts of this case coupled with Defendants' admissions clearly establish that the units shipped by Direct Wholesale and seized at ICE on 1 February 1994 were from Direct Wholesale and were counterfeit. Microsoft directs the Court's attention to Williams' statements that Direct Wholesale regularly shipped software products to ICE; that the products were normally shipped out of California; and, that prior to the seized shipment, Direct Wholesale had very little difficulty with ICE in terms of payment. (Williams Dep., p. 48–49).

The Court is satisfied that Microsoft has demonstrated that Defendants were engaged in copying Microsoft's software products. "Copying can be shown by circumstantial evidence of access to the copyrighted work, and substantial similarity between the copyrighted work and the infringer's work." *Johnson Controls*, 886 F.2d at 1176) (citations omitted). Defendants do not dispute that they had access to Microsoft's copyrighted work. Nor do they deny the substantial similarity between the seized software and Microsoft's copyrighted work.

Moreover, nothing in the facts support Defendants' conspiracy theory that some unidentified person or persons removed the units shipped from Direct Wholesale and replaced them with the seized units. The counterfeit software from Direct Wholesale was seized upon delivery. At no time did anyone other than the United States Marshal's Service or the court-appointed custodian have possession, custody or control over the counterfeit Microsoft Software Products once they were delivered to ICE. This is self-serving conjecture on the part of Defendants and mere conjecture is not enough to create a genuine issue of material fact sufficient to withstand summary judgment. *See Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1323 (4th Cir.1995).

Nor is the Court persuaded by Defendants' argument that the examination Microsoft conducted is flawed. Defendants urge

that Microsoft's expert, Kristi Bankhead, examined only one unit of each type of the counterfeit software.[4] They assert that a single examination of each type of software is not proof that all of the software products were counterfeit. By this argument Defendants attempt to have the Court place an unreasonably high burden on Microsoft to show that each and every unit of software Defendants ever shipped was counterfeit. Microsoft has met its burden by showing that Defendant had access to and copied Microsoft's copyrighted work and that is all it is required to do.

The Court is satisfied that Ms. Bankhead conducted a thorough examination of the software units. The Court is also satisfied that the counterfeit units that Ms. Bankhead did examine were substantially similar to the approximately forty-five thousand units Direct Wholesale had already distributed. Mr. Tartaro, Microsoft's attorney, stated that he examined the outside of the boxes containing the counterfeit software which had an "Allstates Air Cargo" label affixed to them. He then opened the boxes and found that they contained counterfeit versions of Microsoft's MS–DOS 6, MS–DOS 6.2 and Windows 3.1. He examined every unit therein to determine if they were identical. After determining that the units in a particular box appeared identical, he removed one unit and compared them with a sample unit and determined that the sample unit appeared identical. Only after Mr. Tartaro examined each box did he forward one unit of each software product to Ms. Bankhead. *See* Tartaro and Bankhead Declarations.

After receiving the units, Ms. Bankhead compared the products to Microsoft's products. She not only carefully examined the packaging and software, but she also examined the accompanying manuals. From this examination, she was able to determine that the products were counterfeit. The fact that

Defendants never bothered to depose Ms. Bankhead or examine any of the information she used to reach her conclusions supports the Court's conclusion that Defendants' argument is, again, self-serving and without merit.

■ Moreover, Microsoft conducted a thorough examination of the business records seized from Direct Wholesale. *See* Agranov Declaration. Using sales invoices seized from Direct Wholesale on 4 February 1994, Microsoft was able to determine that Direct Wholesale distributed counterfeit versions of Microsoft's software products. Based on Microsoft's depositions of Mazoch and Williams, Microsoft further determined that Direct Wholesale used Allstates Air Cargo for shipping software. The evidence Microsoft provided to the Court is clear and overwhelming that Direct Wholesale distributed tens of thousands of the counterfeit software products. Defendants' argument that some of the software products *might* have been genuine is, thus, mere speculation and does not create a triable issue of fact. *Thompson Everett, Inc.,* 57 F.3d at 1323. Even assuming, *arguendo,* that only one unit was counterfeit, there would still be a violation of the Copyright Act. The Act does not require extensive copying on the part of a defendant before a plaintiff can bring a claim for infringement. Rather, the Act ensures an owner the exclusive right to distribute or limit the distribution of its product.

## B. Trademark Infringement

■ Microsoft also moves for summary judgment on its trademark infringement claim under the Lanham Act, 15 U.S.C. § 1114(1).[5] The Lanham Act provides in pertinent part:

(1) Any person who shall, without the consent of the registrant—

 (a) use in commerce any reproduction, counterfeit, copy or colorable limitation

---

4. Ms. Bankhead is a paralegal in Microsoft's law and corporate affairs department. As such, she is responsible for investigating reports concerning the distribution of infringing copies of Microsoft's products. In investigation software piracy, she has become completely familiar with the manufacturing specifications and quality control standards for the component parts of Microsoft

software products, including the component manuals and packaging.

5. Defendants use many of the same arguments as they did with the copyright infringement claim. Generally, the Court will not repeat those arguments.

of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ...

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1). "Under 15 U.S.C.A. § 1114(1), the test for trademark infringement is whether there is a likelihood of confusion." *Polo Fashions, Inc. v. Craftex, Inc.,* 816 F.2d 145, 148 (4th Cir.1987); *see also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 930 (4th Cir.1995). The Court may properly decide the issue of trademark infringement liability by way of summary judgment and Microsoft need not show intent to infringe in order to prove liability. *Brittingham v. Jenkins,* 914 F.2d 447 (4th Cir.1990); *Quality Inns Int'l, Inc. v. McDonald's Corp.,* 695 F.Supp. 198, 221 (D.Md.1988); *Polo Fashions, Inc. v. Gordon Group,* 627 F.Supp. 878, 889 (M.D.N.C. 1985). Rather, Defendants' intent goes to the issue of damages. *See* 15 U.S.C. § 1117(b).

### 1. Valid, Protectible Trademark

Microsoft has caused its trademarks to be registered in the United States Patent and Trademark Office on the Principal Register. Specifically, Microsoft is the owner of Registered Trademark No. 1,256,083, issued 1 November 1983, in and to "Microsoft" for use in connection with "computer hardware and software manuals; newsletter featuring information about computer hardware and software and general information relating to computers for manufacturers, distributors, and users of computers and computer software, and computer documentation—namely, reference, user, instructional and general utilities manuals and data sheets for computer hardware and software users." (Bankhead Decl. ¶ 8 and Exh. 3 attached thereto).

Microsoft is the owner of Registered Trademarks Nos. 1,315,570 and 1,314,584, is-

sued 22 January 1985 and 15 January 1985 respectively, in and to "MS-DOS" for use in connection with computer programs prerecorded on tapes, disks, diskettes, cartridges and cassettes; and computer programs and programmer's references and user's guide manuals sold as a unit and computer documentation—namely, reference user and instructional manuals and data sheets, respectively. Microsoft's trademarks have all acquired incontestable as set forth in 15 U.S.C. § 1115(b).[6] (Bankhead Decl. ¶¶ 10, 12 and Exhs. 5 & 7 attached thereto). Moreover, "a certificate of registration of a mark serves as *prima facie* evidence that the registrant owns the registered mark, has properly registered it under the Lanham Act, and is entitled to its exclusive use in commerce." *Brittingham,* 914 F.2d at 452.

### 2. Defendants' Unauthorized Use In Commerce

In order to show that Defendants used Microsoft's trademark "in commerce", Microsoft need not show actual use or intended use in interstate commerce. " 'Commerce' means all commerce which may be lawfully regulated by Congress." 15 U.S.C. § 1127. Thus,

[i]t is well established that 'jurisdiction exists to grant relief under the Lanham Act if a defendant's activities although wholly intrastate tend to have a damaging effect on plaintiff's federally protected interstate business.'

*Purolator, Inc. v. EFRA Distributors, Inc.,* 687 F.2d 554, 559 (1st Cir.1982) (quoting *Tiffany & Co. v. Boston Club, Inc.,* 231 F.Supp. 836, 841 (D.Mass.1964)); *see also World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 488 (5th Cir. 1971) (" '[I]n commerce' is intended to refer to the impact that the infringement has upon the interstate use of the trademark and not to mean that an infringer is immune from interference with an interstate trademark so long as he keeps his infringement within the confines of a state.") (citing 15 U.S.C.A.

---

**6.** Under 15 U.S.C. § 1115(b), a trademark becomes incontestable after five years of continuous and unchallenged use and after the holder files an affidavit with the Patent and Trademark

Office stating such within one year after the five year period. Defendants do not dispute that Microsoft has valid, protectible trademarks which have become incontestable.

§ 1127). Where, as here, Plaintiff is a large corporation conducting business in numerous states, and worldwide, a presumption arises that the Defendants' intrastate activities have a substantial effect on interstate commerce. *See Minute Man of America, Inc. v. Coastal Restaurants, Inc.*, 391 F.Supp. 197, 200 (N.D.Tex.1975) ("Plaintiff is a multi-state corporation.... Obviously, an infringement on the Plaintiff's federal trademark would have a significant on interstate commerce.").

Under *Minute Man*, Microsoft is entitled to a presumption that Defendants' production of the infringing Microsoft packaging has a substantial effect on interstate commerce for purposes of § 1141(1). This is a presumption that Defendants have not and, based upon the evidence in this case, cannot rebut. Microsoft has also provided evidence of Defendants' interstate activity. Regarding sales and purchases of the counterfeit software products, Direct Wholesale has dealt with A–Tech, Hypertec and Fantasy Unlimited of California; ICE of Maryland; BSM of Miami, Florida; Futureware Distributing of Omaha, Nebraska; and, J & S Camera of Westbury, New York. *See* Mazoch Dep., pp. 31–35. Neither Direct Wholesale, nor Williams, nor Mazoch have ever been licensees of Microsoft. Microsoft has not authorized Defendants to make, use or distribute copies of Microsoft's registered trademarks in connection with the distribution of purported Microsoft MS–DOS and Windows software products.

 Defendants do not dispute that they are not Microsoft licensees. Rather, they make the weak argument that

> Microsoft ... fails to state its own standards for quality control for reproductions of its software such as DOS and Windows. Microsoft makes no showing whatsoever of its standard, acceptable deviation for manufactured copies of diskette labels, user manuals and shrink-wrap packaging. If the standard for genuine Microsoft software is not clearly articulated, with the concomitant acceptable levels for deviations of reproducing software units, then how can a rational trier of fact—not to mention a purported expert—accurately assess whether goods are genuine or not.

*See* Opposition, p. 7. This argument misses the point that under the Lanham Act, Microsoft is entitled to *exclusive* use of its marks in commerce. *See Lone Star Steakhouse & Saloon*, 43 F.3d at 932. As such, Microsoft has the exclusive right to choose whom it will license to use its trademarks. It is undisputed that Microsoft has not chosen Defendants. Even assuming, *arguendo*, that Defendants were authorized licensees of Microsoft products, "[g]oods [ ] that do not meet the trademark owner's quality control standards will not be considered genuine goods, and their sale will constitute trademark infringement." *Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir.1994) (citation omitted). The fact that Defendants are not aware of Microsoft's licensing provisions only supports the indisputable conclusion that they, nor any of the businesses with which they dealt, are not and were not licensees.

### 3. Likelihood of Confusion

"The hallmark of any trademark infringement claim" is consumer confusion. *Polymer Technology Corp.*, 37 F.3d at 80. In making the likelihood of confusion showing, Microsoft "need not demonstrate actual confusion." *Lone Star Steakhouse & Saloon*, 43 F.3d at 933 (citing *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir.1984)). Rather, the likelihood of confusion issue is "an 'inherently factual' issue that depends upon the facts and circumstances in each case." *Id.* (quoting *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir.1992) *cert. denied*, 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992)).

 In making the likelihood of confusion issue, the Court must consider seven factors. Mainly,

> (1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods and services that the marks identify; (4) the similarity of the facilities that the two parties use in their businesses; (5) the similarity of the advertising the two parties use; (6) the defendant's intent; and (7) actual confusion. *Pizzeria Uno*, 747 F.2d at 1527. Importantly, not all these factors are of equal relevance in every case. *Id.*

*Id.* Other courts have included similar factors in determining the likelihood of confusion issue. *See e.g. Microsoft Corporation v. CMOS Technologies, Inc.,* 872 F.Supp. 1329, 1335 (D.N.J.1994) (similarity between marks, price and length of time defendant used mark without evidence of actual confusion are also among the myriad of factors for consideration). "[W]hen the trademark owner and the alleged infringer are in direct competition, it is rarely necessary to look beyond the mark itself to decide if there has been an infringement." *Id.* (citing *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 472 (3d Cir.1994)).

■ Applying the relevant factors to this case, the Court concludes that Defendants' infringing activities caused consumer confusion. Microsoft's marks are world renowned and Defendants do not dispute the strength or the distinctiveness of the marks. Defendants also do not, as they cannot, dispute that the marks they used in distributing the counterfeit software products were virtually identical to Microsoft's marks. Based upon a review of the evidence, including deposition testimony and seized business records, Defendants clearly intended for the consuming public to believe that the marks they used were the valid and incontestable Microsoft marks. Based upon Direct Wholesale's sales invoices, Defendants achieved their purpose.

■ Where, as here, the goods distributed by Defendants are intentional copies and virtually identical to the trademark owner's goods, likelihood of confusion may be established at the summary judgment stage. *Maryland Stadium Authority v. Becker,* 806 F.Supp. 1236, 1241 (D.Md.1992), *aff'd,* 36 F.3d 1093 (4th Cir.1994); *Polo Fashions,* 627 F.Supp. at 887. As one court has stated [i]t would be difficult to imagine a clearer case of consumer confusion than the instant case in which defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's

registered marks appear in their entirety. Under these circumstances, the likelihood of consumer confusion, mistake or deception is clear.

*Microsoft Corp.,* 872 F.Supp. at 1335. There is no genuine issue of material fact. Defendants violated 15 U.S.C. § 1141(1) and Microsoft is entitled to judgment as a matter of law.

**C. Unfair Competition**

■ Microsoft also complains of unfair competition under state law. Maryland Commercial Law § 13–301(1) defines unfair or deceptive trade practices to include "any false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." Md.Code Ann., [Com.Law II] § 13–301(1) (1990). The test for unfair competition under state law is the same as that under the Lanham Act—likelihood of confusion. *Scotch Whisky Association v. Majestic Distilling Company, Inc.,* 958 F.2d 594, 597 (4th Cir.1992), *cert. denied,* 506 U.S. 862, 113 S.Ct. 181, 121 L.Ed.2d 126 (1992).

■ Microsoft has demonstrated likelihood of confusion. Moreover, Microsoft has demonstrated actual confusion. According to one consumer, ICE, it believed that it was purchasing *bona fide* Microsoft computer software from Defendants. Recognizing the deception, ICE has also filed a motion for summary judgment regarding issues of liability and damages. Upon all the evidence, Microsoft is entitled to summary judgment for unfair competition.

**D. False Designation of Origin**

■ The Court also concludes that Microsoft is entitled to summary judgment on its claim for false designation of origin under 15 U.S.C. 1125(a)(1).[7] Under the Lanham

7. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (1988 and Supp. V 1993) provides:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false

or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsor-

Act, Microsoft is entitled to national protection of its marks thereby allowing Microsoft to secure "the goodwill of its business and to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985).

> Again, this is a typical case brought by a plaintiff who is in competition with the defendant, and charges the defendant with using a mark—a brand name, a word, 'a slogan, a symbol, a combination of words and symbols, an ornamental feature, a distinctive shape, or something else intended to remind the consumer of the brand'—so similar to that of the plaintiff's that the public may be confused as to the source of the good or service.

*Advanced Resources International, Inc. v. Tri–Star Petroleum Company*, 4 F.3d 327, 334 (4th Cir.1993) (quoting *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 609 (7th Cir.1986)) (other citations omitted). As the Court has already stated, Defendants intentionally distributed copies which were virtually identical to Microsoft's marks. Defendants' use of Microsoft's marks in connection with unauthorized products falsely implies or represents Microsoft's sponsorship and approval of those products. *See Baskin–Robbins Ice Cream Co. v. D & L Ice Cream Co.*, 576 F.Supp. 1055 (E.D.N.Y.1983); *see also, Quality Inns International, Inc. v. McDonald's Corporation*, 695 F.Supp. 198, 210–211 (D.Md.1988) (mark will be protected on any goods which buyers would be likely to think came from same source as goods belonging to mark's owner). Concluding that Defendants have presented no plausible opposition regarding Microsoft's claim under 15 U.S.C. § 1125, the Court will also grant summary judgment on this claim.

### E. Unauthorized Distribution/Intentional Infringement

■ Microsoft asserts that not only did Defendants infringe its copyrights and trade-

marks but they did so intentionally. Defendants counter that Microsoft has failed to meet their burden of proof in showing that Defendants' activities were intentional. The Court disagrees.

The facts indicate that Defendants Williams and Mazoch were very familiar with the software industry at the time they opened Direct Wholesale. Defendants were also familiar with licensing and distribution practices among the industry. They knew Microsoft had specific guidelines regarding licensing and distribution for its software products and they do not deny that they received news releases which outlined Microsoft's licensing practices.

Defendants knew that Microsoft did not distribute its software without an accompanying personal computer. Indeed, each unit of the purported Microsoft software bore the legend that the software was "for sale only with a new PC". Yet, Defendants never questioned any of their suppliers. Instead, they turned a blind eye to the business practices of their suppliers and other software manufacturers. This alone is enough to defeat Defendants' claims that they were innocent infringers. *See Microsoft Corp.*, 872 F.Supp. 1329, 1340–1341 (D.N.J.1994); *Little Mole Music v. Spike Investment, Inc.*, 720 F.Supp. 751, 755 (W.D.Mo.1989).

Yet, even more damaging is Defendants' very own business records and practices. Direct Wholesale used a cryptic coding system to hide what brand of software product they were selling. When compared with the sales invoices the coding system was easily decipherable, and what Direct Wholesale was masking was counterfeit Microsoft software products.

Williams and Mazoch testified that while A–Tech, Hypertec and Fantasy Unlimited were three suppliers from whom they purchased the counterfeit Microsoft software products, they regularly called their contacts from the different companies using a single company phone number, A–Tech's. Williams

---

ship, or approval of his or her goods, services or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or

another person's goods, services, or commercial activities,
shall be liable in civil action by any person who believes that he or she is or is likely to damaged by such act.

Dep., pp. 20–21. They knew that A–Tech, Fantasy Unlimited and Hypertec were really one operation. *Id.;* Mazoch Dep., pp. 45, 77–78. In at least one transaction, Direct Wholesale purchased counterfeit Microsoft products from Hypertec and was first instructed to make a certified check payable to Hypertec, then to A–Tech and then to Fantasy Unlimited. Williams Dep., pp. 20–21. Mazoch also testified that he knew that Microsoft had cancelled the licenses of several original equipment manufacturers.

A typical Direct Wholesale transaction involving counterfeit Microsoft products involved a shipping scheme specifically designed to disguise the true nature of the goods that were being purchased and distributed by Direct Wholesale. On every shipping order, Direct Wholesale described the boxes containing the counterfeit software as containing "manuals." Direct Wholesale also typically paid its California suppliers by wiring cash to the personal bank account of Willie Banks, an Allstates Air Cargo truck driver. Banks then converted the wire transfer to cash or check and paid for the goods when picked up. The pick-up locations was rarely the same for the supplier and Allstates usually called the California supplier to ascertain the exact location. Williams Dep., pp. 17–18. Once he picked up the counterfeit software, Banks placed a Direct Wholesale shipping label on the boxes of "manuals" in order to hide the true origination of the boxes. Mazoch Dep., p. 49. Indeed, according to Williams, during the entire time in which Direct Wholesale sold the counterfeit Microsoft products, it never stored, or even saw, a single unit of the 45,848 units of counterfeit products it distributed. Williams Dep., p. 36.

The Court finds that Defendants intentionally distributed 45,848 units of counterfeit Microsoft software products.

> This is not a case where an infringer developed what he imagined to be a proper trademark only to find out later that his trademark caused confusion as to its source, and therefore infringed a product with a registered trademark. Quite to the contrary, [Defendants] are not innocent infringers ...

*Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.,* 692 F.2d 1272, 1276 (9th Cir. 1982).

## F. Individual Liability

■ Microsoft asserts that Williams and Mazoch are contributorily and vicariously liable for Direct Wholesale's infringement of Microsoft's registered copyrights and trademarks. It claims that both Williams and Mazoch were each personally involved in acquiring and distributing the infringing software products. Microsoft urges that Williams and Mazoch not only had the right and ability to supervise the acquisition and distribution of counterfeit Microsoft software products, but they, themselves, conducted the infringing activities.

Defendants do not deny that they were not licensed to distribute Microsoft's products. They do not deny that they knew that the products were to be sold only with a new personal computer. Rather than providing the Court genuine issues of material fact, Williams and Mazoch simply argue theories and suppositions regarding Microsoft's claims. The Court, however, will not deny an otherwise valid motion for summary judgment because of Defendants' supposition and theory.

■ Williams and Mazoch knew about and participated in the infringing activities of Direct Wholesale because, for all intents and purposes, they were Direct Wholesale. A party who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, will be held liable as a contributory infringer and is jointly and severally liable for the infringement. *See Polymer Technology Corp. v. Mimran,* 975 F.2d at 64. This general rule is applicable to trademark infringement and unfair trade practices cases. *See Polo Fashions,* 816 F.2d at 149. Even assuming, *arguendo,* Mazoch and Williams acted primarily for the benefit of Direct Wholesale, they may still be held personally liable. *See id.* ("A corporate official may be held personally liable for tortious conduct committed by him, though committed primarily for the benefit of the corporation.").

■ Moreover, a party will be held vicariously liable for another's infringement if that

party had (1) the right and ability to supervise the activity and (2) an obvious and direct financial interest in the exploitation of the copyrighted materials. *Southern Bell Telephone & Telegraph Co. v. Associated Telephone Directory Publishers*, 756 F.2d 801, 811 (11th Cir.1985); *Major League Baseball Promotion Corp. v. Colour–Tex, Inc.*, 729 F.Supp. 1035, 1043 (D.N.J.1990); *Boz Scaggs Music v. KND Corp.*, 491 F.Supp. 908, 913–914 (D.C.Conn.1980). As Direct Wholesale's sole shareholders and directors, Williams and Mazoch had the ability to supervise the activity. They shared a financial interest so direct and obvious that they willfully turned a blind eye to their acquisition of counterfeit Microsoft software from suppliers.

■ Even assuming, *arguendo*, that they initially lacked experience for conducting Direct Wholesale's affairs, Williams and Mazoch learned shortly after initiating business with their California suppliers that something was awry. They knew about Microsoft's licensing requirements. They knew that the California suppliers and Williams and Mazoch personally violated those requirements because they were not authorized licensees and because they sold the purported Microsoft software without personal computers. Their actions amounted to infringement and ignorance of the law, if there was ignorance, is no excuse. *See Lambert v. California*, 355 U.S. 225, 228, 78 S.Ct. 240, 242, 2 L.Ed.2d 228 (1947). Thus, Williams and Mazoch are contributorily and vicariously liable. They are jointly, and, thus, jointly and severally liable. Since the Court concludes that Williams and Mazoch willfully participated in the infringement, they are also personally liable. *See Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971).

## G. Damages [8]

### 1. Intentional and Knowing Copyright Infringements

■ Under relevant provision of the Copyright Act, Microsoft is entitled to "(1) its actual damages and any additional profits of the infringer …; or (2) statutory damages …." 17 U.S.C. § 504(a). Where, as here, the Defendants violate both the Lanham Act and the Copyright Act, the plaintiff is entitled to recover both statutory damages under the Copyright Act and actual damages under the Lanham Act. *Nintendo of America, Inc. v. Aeropower Company, Ltd.*, 34 F.3d 246, 251 (4th Cir.1994). For Defendants' copyright infringement, Microsoft has elected to recover statutory damages.

■ The Court has broad discretion in setting the amount of statutory damages under the Copyright Act. *Shell Oil Company v. Commercial Petroleum, Inc.*, 928 F.2d 104, 108 (4th Cir.1991) (citing 15 U.S.C. § 1117 (1988)). In assessing damages, the Court may consider the infringer's intentions. Once an owner establishes willful infringement, the Court may increase an award of damages up to the maximum of $100,000 per infringement. 17 U.S.C. § 504(c).

■ Courts have held that an infringer's actions are willful where he had knowledge that his conduct constituted infringement or where he showed a reckless disregard for the owner's rights. *Wildlife Express Corporation v. Carol Wright Sales, Inc.*, 18 F.3d 502 (7th Cir.1994); *N.A.S. Import Corporation v. Chenson Enterprises, Inc.*, 968 F.2d 250 (2nd Cir.1992). Thus, knowledge need not be actual; constructive knowledge will suffice. Here, the irrefutable evidence gives rise to an inference of Defendants' intentional, knowing and willful infringement. Defendants' conduct, business practices and knowledge of Microsoft's licensing practices support the Court's conclusion that Defendants intentionally infringed upon Microsoft's copyrights. Accordingly, the Court will impose the maximum penalty authorized by the statute. The Court will award Microsoft $300,000 in damages for Defendants' intentional infringement of its copy-

---

8. While not requested, Microsoft is entitled to damages for its common law claims. *Five Platters, Inc. v. Purdie*, 419 F.Supp. 372, 384 (D.Md. 1976). It seeks a permanent injunction under the Lanham Act, a remedy which is also proper for common law unfair competition. *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651, 664 (W.D.Wash.1982).

rights in MS–DOS 5.0, MS–DOS 6.0 and 6.2, and Windows 3.1 and 3.11.

### 2. Intentional and Knowing Trademark Infringements

■ Separate and apart from damages under the Copyright Act, the Court may also award Microsoft damages for trademark infringement under the Lanham Act. *Nintendo of America*, 34 F.3d at 251. "An award is within the sound discretion of the trial court and will not be disturbed absent abuse of that discretion." *Lindy Pen Company, Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1409 (9th Cir.1992) (citing *Transgo, Inc. v. Ajac Transmission Parts Corporation*, 768 F.2d 1001, 1026 (9th Cir.1985), *cert. denied* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986)).

The damages provision of the Lanham Act provides:

> When a violation of any right of the registrant of a mark ... shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, ... to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

15 U.S.C. § 1117(a). Where, as here, the Court finds that the defendant intentionally used the infringing mark, knowing it was counterfeit, it may treble the damages. 15 U.S.C. § 1117(b).

In order for Microsoft to recover actual damages for trademark infringement, it must prove actual injury. However, the Court may award equitable damages, using Defendants' profits, without proof of actual loss. *Shell Oil Co.*, 928 F.2d at 108; *also see Lindy Pen Co.*, 982 F.2d at 1407 ("Trademark remedies are guided by tort law principles ... As a general rule damages which result from a tort must be established with *reasonable* certainty.") (emphasis added). Moreover, where a plaintiff seeks statutory damages he is relieved from the burden of proving actual damages. *See Gnossos Music v. Mitken, Inc.*, 653 F.2d 117, 118 (4th Cir. 1981) (citing *Douglas v. Cunningham*, 294 U.S. 207, 209, 55 S.Ct. 365, 366, 79 L.Ed. 862 (1935)). Microsoft's actual damages are, at least, the profits which it lost as a result of Defendants' infringement of its trademarks.

To calculate its actual damages, Microsoft seeks to recover its lost profits by multiplying the per unit lost profit by the number of infringing items that Direct Wholesale distributed. *See Ford Motor Co. v. Kuan Tong Industrial, Co.*, 697 F.Supp. 1108, 1109 (N.D.Cal.1987). Per unit profits is "what a willing buyer would have been reasonably required to pay to a willing seller for" the infringing works. *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corporation*, 562 F.2d 1157, 1174 (9th Cir.1977).

Direct Wholesale distributed the infringing software products from February 1993 through January 1994. Microsoft offers the declaration of Norman Tonina to show that this period covers the third and fourth quarters of Microsoft's 1993 fiscal year and the first, second and third quarters of the 1994 fiscal year. (Tonina Decl. ¶ 3). The evidence, including Williams' and Mazoch's admissions, clearly establishes that Direct Wholesale distributed 660 units of MS–DOS in the period covering the third quarter of the 1993 fiscal year; 2,302 units in the fourth quarter of fiscal year 1993; 4,972 units in the first quarter of fiscal year 1994; 7,822 units in the second quarter of fiscal year 1994; and 1,748 units in the third quarter of fiscal year 1994. From February 1993 through January 1994, Direct Wholesale distributed two units of MS–DOS.

Microsoft also seeks damages for lost profits due to Direct Wholesale's distribution of infringing Windows products. The evidence clearly establishes that, at a minimum, Direct Wholesale distributed 258 units of Windows during the period covering the third quarter of fiscal year 1993; 1,709 units in the fourth quarter of fiscal year 1993; 8,962 in the first quarter of fiscal year 1994; 9,235 units in the second quarter of fiscal year 1994; and, 8,170 units in the third quarter of fiscal year 1994. Direct Wholesale also distributed eight units during the period from February 1993 through January 1994.

Based on the documentation Microsoft submitted to the Court, it suffered $458,454.26 and $838,067.46 in lost profits due to Direct Wholesale's distribution of counterfeit MS–DOS and Windows, respectively. Micro-

soft's total loss for both products is $1,296,-521.72. Microsoft sustained this loss due to Defendants' willful violation of the Lanham Act.

Based on the Court's finding that Defendants' actions were wilful, it will award treble damages.

Under the amended Lanham Trade–Mark Act, absent 'extenuating circumstances,' federal courts are expected, not merely authorized, to enter judgment for three times such profits or damages, whichever is greater, together with reasonable attorneys' fees for intentional use of trademark knowing it to be counterfeit.

*Microsoft Corp.*, 872 F.Supp. at 1339. There is no bright line rule for what constitutes extenuating circumstances. Rather, courts must make a case-by-case analysis. *See id.*

The Court concludes that this case lacks any extenuating circumstances preventing the award of treble damages. *See id.* at 1339 ("Where the defendant is an 'unsophisticated individual, operating on a small scale, for whom the imposition of treble damages would mean that he or she would be unable to support his or her family' treble damages may be inappropriate.") (quoting Joint Explanatory Statement, 130 Cong.Rec.H. 12,076 at 12,083 (Oct. 10, 1984)). Williams and Mazoch are experienced businessmen. They had experience in the computer industry and had enough business sense to form Direct Wholesale. Their own business practices suggest that they not only knew that they were infringing Microsoft's products but welcomed the opportunity. Even assuming, *arguendo*, that their acts were not intentional, they turned a blind eye to all indicia of infringement. Since "willful blindness can be the basis for an award of treble profits", the Court has no hesitation in trebling Microsoft's lost profits. *Id.* (citing *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472 (11th Cir.1991); *Louis Vuitton S.A. v. Lee*, 875 F.2d 584 (7th Cir.1989); *Levi Strauss & Co. v. Diaz*, 778 F.Supp. 1206 (S.D.Fla.1991)). Accordingly, the Court will issue an order awarding Microsoft $3,889,-565.16 for treble profits resulting from Defendants' trademark infringing activities.

### 3. Costs and Attorneys' Fees

■ Microsoft has also submitted an application for the award of its attorneys' fees. Where a case is exceptional, the Court may also award reasonable attorneys' fees. 15 U.S.C. § 1117. Courts have held that "[a] trademark case is exceptional for purposes of an award of attorneys' fees where the infringement is malicious, fraudulent, deliberate or wilful." *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1384 (9th Cir.1984) (citing *Playboy Enterprises v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1276 (9th Cir. 1982); *also see Quality Inns Int'l*, 695 F.Supp. at 222. "Typically, attorneys' fees cases involve deliberate attempts by the defendant to pass off its goods as those of the plaintiff by applying plaintiff's trademark to defendant's goods." *Ferrero v. Ozak*, 952 F.2d 44, 48–49 (3d Cir.1991).

Since the defendants' actions cannot be justified as either a reasonable attempt to develop their own trademark or as the result of innocent confusion concerning the existence of the well recognized [Microsoft] trademarks, [the Court] cannot escape the conclusion that the 1975 amendment to the Lanham Act was specifically directed towards eliminating such blatant activity.

*Playboy Enterprises*, 692 F.2d at 1276. The Court concludes that Microsoft is entitled to an award of attorneys' fees.[9]

### 4. Permanent Injunction, Impounding and Disposition

■ Microsoft seeks a permanent injunction enjoining Defendants from further infringing Microsoft's software products. The relevant portion of the Copyright Act provides:

The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to principles of equity and upon

---

9. Microsoft has moved to file an exhibit under seal in support of its application for attorneys' fees. The Court will grant Microsoft's motion to file the exhibit under seal and will issue a separate order therein determining the amount of attorneys' fees to be awarded after it has had time to properly review the exhibit.

such terms as the court may deem reasonable to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office.

15 U.S.C. § 1116(a).

■ When a copyright plaintiff establishes a threat of continuing infringement, he is entitled to an injunction. *Universal City Studios v. Sony Corp. of America,* 659 F.2d 963, 976 (9th Cir.1981), *rev'd on other grounds,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); *Walt Disney Co. v. Powell,* 897 F.2d 565, 568 (D.C.Cir.1990) (footnote omitted). Microsoft has shown that Direct Wholesale's customers were misled into believing that they were purchasing legitimate Microsoft software products. In a case such as this, a mere tap on the hand will not prevent Defendants from misleading customers in the future. *See Microsoft Corp.,* 872 F.Supp. at 1336. Accordingly, the Court will permanently enjoin Defendants from seeking to sell, selling or distributing counterfeit computer software products bearing Microsoft's marks. Additionally, under 17 U.S.C. § 503(b), as part of a final judgment or decree, the Court may order the destruction or other reasonable disposition of all infringing goods. The Court will so order. The Court will also issue an order discharging Microsoft's bond.

### CONCLUSION

For the foregoing reasons, the Court will issue an order granting Microsoft's motion for summary judgment. The Court will award Microsoft all profits earned by Direct Wholesale from its sell of the counterfeit Microsoft software products from February 1993 through January 1994. Because this is an exceptional case of infringement, the Court will also treble damages consistent with the Lanham Act and award Microsoft reasonable attorneys' fees and costs. Moreover, because of the deliberateness of Defendants' infringing activities, the Court will enter a permanent injunction against Defendants. The Court will so order.

### ORDER

For the reasons set forth in the attached Memorandum Opinion, IT IS this 21st day of December 1995 by the United States District Court for the District of Maryland, Southern Division, hereby **ORDERED:**

1. Defendants Direct Wholesale, Inc., Dewitt Williams and Timothy Mazoch are liable to Microsoft Corporation for:

 a. Infringement of registered copyright Nos. TX 2 946 505, TX 3 117 331, TX 3 546 169, TX 3 776 782 and TX 3 307 091.

 b. Trademark infringement under federal law, 15 U.S.C. § 1114 *et seq.,* and under the laws of the State of Maryland, resulting from their use and reproduction of Microsoft's trade dress and use and imitation of Microsoft's registered trademarks, Nos. 1,200,236; 1,256,083; 1,315,570; and, 1,314,584.

2. Microsoft Corporation has been actually damaged by Defendants in the sum of $4,189,565.16 which is computed as follows:

 a. Statutory damages of $300,000.

 b. Actual damages of $1,296,521.72.

 c. Treble damages of $3,889,565.16.

3. Defendants Direct Wholesale, Inc., Dewitt Williams and Timothy Mazoch are jointly and severally liable to Microsoft Corporation for the above damages;

4. Dewitt Williams and Timothy Mazoch are vicariously and contributorily liable to Microsoft Corporation for those damages;

5. Defendants Direct Wholesale, Inc., Dewitt Williams and Timothy Mazoch BE, and the same hereby ARE, permanently enjoined from those acts described in a separate Order of Permanent Injunction to be approved and executed by this Court;

6. Microsoft Corporation is entitled to reasonable attorneys' fees and its costs incurred herein. Microsoft's motion to submit its attorneys' fees under seal BE, and the same hereby IS, **GRANTED;**

7. Microsoft is hereby and forever released and discharged from liability for any acts arising from or in connection with Microsoft's request for, and this Court's issuance of, the Temporary Restraining Order, Preliminary Injunction and Seizure Order in this action;

8. The surety company BE, and the same hereby IS, directed to release the bond for the Orders;

9. The substitute custodian may destroy all counterfeit and infringing goods and business records seized pursuant to the Court's February 4, 1994 seizure order; the substitute custodian may destroy or otherwise dispose of any other seized property in his possession held for the benefit of Microsoft; and, the substitute custodian BE, and the same hereby IS, and forever released and discharged from liability for any acts arising from or in connection with any further responsibility in this matter.

10. That Third–Party Plaintiff's, Integrated Computer Electronic, Inc., "ICE", motion for summary judgment BE, and the same hereby IS, **GRANTED;**

11. That attorney for ICE shall submit an application for attorneys' fee, if any, no later than five (5) days from the date of this Order;

12. That the Clerk of the Court **CLOSE** this case;

13. That the Clerk of the Mail a copy of this Order and attached Memorandum Opinion to all parties of record.