36 F.3d 1093
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Earl W. RICKMAN, Jr., Plaintiff-Appellant,
v.
DEERE & COMPANY; John Deere Company; John Deere Limited,
Defendants-Appellees.
 No. 93-2303.
 United States Court of Appeals, Fourth Circuit.
 Argued: July 11, 1994.
Decided: September 20, 1994.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. James R. Spencer, District Judge. (CA-92-840)
 Melissa Warner Scoggins, James Curtis Joyce, Jr., Gentry, Locke, Rakes & Moore, Roanoke, Virginia, for Appellant.
 David Henry Worrell, Jr., McGuire, Woods, Battle & Boothe, Richmond, Virginia, for Appellees.
 Paul G. Kockenbrink, Gentry, Locke, Rakes & Moore, Roanoke, Virginia, for Appellant.
 Kelly M. Boehringer, McGuire, Woods, Battle & Boothe, Richmond, Virginia, for Appellees.
 E.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Earl W. Rickman, Jr. brought this diversity suit against Deere & Co. and its subsidiaries raising a series of state-law tort and contract warranty claims arising out of an accident involving a John Deere farm vehicle that left Rickman permanently disabled. The district court granted summary judgment to Deere and Rickman now appeals. We affirm.
 
 
 2
 In February 1991, Rickman was an 18 year-old high school student, who was working almost full time on a dairy farm in western Virginia owned by John and Tommie Jenkins. The cows were fed twice daily, early in the morning and early in the afternoon. One of Rickman's duties was to go with one of the Jenkins brothers and assist in feeding the cows.
 
 
 3
 The cows were fed using a John Deere Model 716A forage wagon, which the Jenkins had bought in November 1985. The forage wagon uses various beaters and floor conveyors to move "silage" out of the wagon through a chute. While "self-unloading," it is not "selfpowered;" instead, it is pulled by a tractor, which also supplies the power, through a rotating driveline or "power take off shaft" (PTO shaft), to operate the machinery of the forage wagon.
 
 
 4
 Structurally, the PTO shaft is essentially a long, telescoping connector between the motor of the tractor and the machinery of the forage wagon. The tractor has at one end a universal joint; the shaft, which is square rather than round, is essentially a long pole that is connected to the tractor's universal joint. At the front of the forage wagon is another universal joint, which connects to the other end of the PTO shaft.
 
 
 5
 The PTO shaft, when in operation, rotates at high speeds to power the belts that operate the machinery of the forage wagon. Because of the danger of entanglement that this poses, the PTO shaft and the universal joints at each end are usually covered by shields. The front portion (i.e., that portion closer to the tractor) of the driveline shaft is covered by a metal tubular guard. The rear portion of the shaft, up to the rear universal joint, is covered by a black polyethylene plastic tube, called a spinner shield, which overlaps the metal tube at the point at which they connect. At the front and back, these tubings are connected to the machines by nylon retainer bearings, and are not supposed to rotate with the shaft. Finally, the forage wagon has a flexible corrugated plastic master shield mounted on its front around the point at which the PTO shaft connects to the universal joint of the forage wagon. This master shield covers the last inches of the PTO shaft as well as the universal joint and internal machinery of the forage wagon. The controls for the forage wagon are located on the front of the wagon, next to the PTO shaft. There are two separate levers to engage the belts and control the speed at which they operate.
 
 
 6
 In short, the standard operation for feeding the cows would involve one of the Jenkins brothers driving the tractor, with the forage wagon hooked up in back, down to the area with the feed troughs. Rickman would walk nearby to open gates and keep cows out of the way. When they had reached the feed area, Rickman would connect the PTO shaft from the tractor to the wagon; he would then wait for a signal from the person driving the tractor and engage the forage wagon machinery by pulling the switches, and unload the chute. The feed would then be sent down the chute into the feed troughs, and the tractor and wagon slowly moved forward as this continued until they reached the end of the feed area and were out of food. At that point, Rickman, who would pace along the wagon as this process continued, would await a signal from the tractor driver and then disengage the forage wagon by throwing the switches again to end the process.
 
 
 7
 The accident occurred during the early morning feeding, at approximately 3:30 a.m. on February 27, 1991. At the time, the PTO shaft was not protected as described above. Sometime during the previous month, the fasteners of the plastic spinner shield that covered the rear part of the PTO shaft had broken loose of the forage wagon anchor, and the spinner shield had slipped forward toward the tractor, overlapping the metal shield significantly. This left some portion of the rotating shaft directly exposed.
 
 
 8
 In addition, five days earlier John Jenkins and farm employee Lewis Bishop had removed the master shield, the attached front plate of the forage wagon, and the entire PTO unit in order to work on the belts of the forage wagon, which were slipping. While they had replaced the PTO unit by the time of the accident, they had not replaced the front plate or the master shield. As a result, the universal joint and the end portion of the shaft usually covered by the master shield also were exposed. Thus, while none of the PTO shaft or the universal joint is exposed when both the spinner and master shields are properly positioned, between the slipping of the spinner shield and the removal of the master shield, 13 1/2 to 15 1/2 inches of the driveline were exposed. The evidence indicates that, if the master shield was in place, 3 1/2 to 5 1/2 inches of the drive shaft would have been exposed due to the migration of the spinner shield.
 
 
 9
 The February morning of the accident was cold. Rickman had on several layers of clothing, including jeans, a t-shirt, a flannel shirt, overalls, and a ragged army jacket. At the end of the feeding, Rickman was standing, with his left arm on the upper lever, looking for a signal from Tommie Jenkins on the tractor to disengage the forage wagon's machinery. His back was to the PTO shaft. He felt a tug at his back, and he says that he tugged back. He specifically says that it wasn't a sleeve that got caught, since he felt the pulling from his back. His jacket then became entangled around the exposed PTO shaft and quickly it drew in the rest of his clothes. He yelled to the tractor that he was caught, and Jenkins disengaged the PTO shaft, but not quickly enough. The drive shaft was spinning from the left side of the wagon towards the right side, and Rickman was flipped over backwards and brought under the shaft. Rickman's neck had hit a guard on the machine as he was flipped, and he suffered severe injuries to his spinal cord.
 
 
 10
 Rickman was essentially bound up to the drive shaft, with all of his clothes from the waist up, except for the collar of his t-shirt, having been drawn in. Jenkins ran to get help and returned to cut Rickman out of his clothing. Bishop, the farm employee, came and placed some coats on Rickman while Rickman was waiting to be cut loose, and Bishop later was responsible for cutting all of Rickman's clothing out of the drive shaft.
 
 
 11
 The crucial element in the case is the question of whether Rickman's clothing became entangled in that area of the drive shaft that was exposed because of the broken spinner shield, which would allow a negligent design case to proceed, or whether it became entangled in the area exposed because of the removal of the master shield, which would insulate the defendants from liability because of the intervening change in the equipment. Neither Rickman nor Tommie Jenkins could tell where along the drive shaft Rickman's clothing became entangled. On the central issue regarding causation, there is thus no direct evidence.
 
 
 12
 Bishop was deposed, and he indicated that he was not present and could not testify as to where Rickman's clothing became entangled. He was responsible for cutting Rickman's clothing off of the shaft at a later point, however, and his deposition testimony offered information about where the clothing that he cut away was located.* Both the questions posed and answers given are relatively unclear, and none of the lawyers attempted to pin Bishop down in a precise way for the record as to where exactly the clothing was located in relation to the universal joint, the exposed portion of the PTO shaft, the spinner shield and the metal shield.
 
 
 13
 Relying on Bishop's testimony, however, Rickman's expert indicated that it was his opinion that Rickman's clothing first became entangled by the square shaft rather than around the universal joint, and that he could rule out with a reasonable degree of engineering certainty that Rickman was not initially entangled in that area of the driveline that would have been covered by the master shield. J.A. 588.
 
 
 14
 Rickman brought suit charging negligent design and manufacture and violation of an implied warranty of fitness. Deere moved for summary judgment. Its principal theory was that Rickman could not offer anything more than a guess as to whether his clothing had become entangled in an area that would support liability or would defeat it, and that absent this evidence as to causation, his case could not proceed. In addition, it argued that, as a matter of law, it had adequately waived all implied warranties in the sales materials related to the purchase of the forage wagon. The district court heard oral argument on these issues, and granted summary judgment for the defendant. It rejected the testimony of Rickman's expert, Knapp, as nothing more than speculation or guesses. It indicated that Knapp had done
 
 
 15
 no independent investigation to support this opinion. He did not personally see the manner in which Rickman's clothing was wrapped around the driveline, nor were any photographs available to him of the clothing on the shaft. Nor did Knapp perform any tests or experiments on the subject forage wagon, or take any measurements of the wagon or its driveline.
 
 
 16
 Thus, in reaching his conclusion and rendering his opinions, Knapp had no information about the length of the master shield or the extent to which the driveline shaft and universal joint would have been covered had the master shield and front plate been in place. Nor did he know how much of the driveline shaft was exposed when, as Bishop testified, the plastic spinner shield slid back to a point where six to eight inches of the plastic spinner shield was protruding from the end of the metal shield.
 
 
 17
 The Court finds that Knapp lacked a sufficiently reliable factual basis upon which to draw his conclusions as to where Rickman's clothing first became entangled with the driveline, and that he was engaging in mere speculation. Knapp's testimony therefore would not be admissible at trial, and cannot serve to create a material issue of fact for summary judgment purposes.
 
 
 18
 J.A. 778-79. The court also found that Deere had properly disclaimed all implied warranties, and that this disclaimer was not unconscionable.
 
 
 19
 Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only where the moving party shows that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The court's function at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). We therefore must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).
 
 
 20
 Nevertheless, the party opposing summary judgment must satisfy the burden of proof by offering more than a mere "scintilla" of evidence, and must produce evidence sufficient for a reasonable jury to find in her favor. Anderson, 477 U.S. at 252. Summary judgment is thus appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, id. at 248-49, such as where the non-moving party has failed to make a sufficient showing on an essential element of the case that the non-moving party has the burden to prove. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Our review of a disposition on summary judgment is de novo. Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir.1990) (en banc), cert. denied, 498 U.S. 1109 (1991).
 
 
 21
 Although we have no quarrel with the expertise of Mr. Knapp, and disagree to some extent with the description given by the district court as to Knapp's background investigative work before rendering his opinion, nevertheless we agree that, given the facts of this highly unusual and terribly unfortunate case, summary judgment for Deere was proper on the causation issue. As this court recently noted, "[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137 (4th Cir.1994). In this instance, the district judge believed Knapp's expert opinion lacked a "sufficiently reliable factual basis" due to the inability to determine the initial position at which Rickman's clothing became entangled with the PTO shaft. Without such information, it is impossible to determine whether the alleged defect in the design of the PTO shaft shields was the cause of Rickman's injuries, or whether it was instead the removal of the master shield. Because the district court thus would not admit the testimony of Rickman's expert at trial, it found that Rickman had failed to introduce sufficient evidence to withstand Deere's motion for summary judgment. We agree with the district court's disposition of this matter, and therefore affirm as to the causation issue.
 
 
 22
 Similarly, and for the reasons stated in the district court's opinion, we believe that Deere adequately disclaimed all implied warranties, see Va.Code Ann. Sec. 8.2-316 (Michie 1991). Further, we believe that, applying the Virginia law of unconscionability in contracting, see Management Enterprises v. Thorncroft Co., 416 S.E.2d 229, 231 (Va.1992), this disclaimer of implied warranties was not unconscionable, and the district court's judgment should be affirmed.
 
 AFFIRMED
 
 
 *
 The relevant portion of Bishop's testimony is as follows:
 A: There was--it was just like a big kind of glob right there in the middle of the shaft right there.
 Q: At what part of the shaft?
 A: Kind of more or less like from the square part. A little bit had wrapped back towards the universal joint, and a lot of it on up towards the front up near the metal part of the shaft like towards the tractor.
 Q: Was it wrapped onto the metal part of the shaft?
 A: Yes, it was some wrapped onto the metal part.
 Q: Now, you say it's a big glob, I think you said in the middle of the shaft. Was that all wrapped tightly?
 A: Like I say, especially right there where that square part where it--that was about the tightest part. Back up towards the metal part, I could kind of get it to start unwrapping, but when I got back in there, I had to take a knife to get it out there.
 Q: So at the metal part did you unwrap that without cutting it off?
 A: On the steel part on up a ways, yes. Q: Towards the tractor?
 A: Yes, but when it got back to where it was near the square metal part, I had to cut it loose.
 Q: What about back towards the universal joint? What was back in that direction?
 A: It was a little bit back there. It wasn't that much. I didn't have to cut it loose out the universal joint.
 Q: You said a little bit back there. Are you talking about a few pieces of scraps of material or a shirt? Just what are you talking about?
 A: Just a few scraps of material more or less where it came back to it.
 Q: And how did you get that out?
 A: Just kind of worked it out with my fingers.
 Q: Was it wrapped tight?
 A: Not really. The tightest part was right around the square shaft.
 
 
 J
 A. 506-08