**The GAZETTE NEWSPAPERS, INC.**

v.

**The NEW PAPER, INC.**

**Civil No. JFM–96–1564.**

United States District Court, D. Maryland.

July 2, 1996.

Carol P. Einaudi, Laurence R. Hefter, Robert D. Litowitz, Douglas A. Rettew, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, DC, for plaintiff.

Richard D. Carter, Mercedes J. Madole, Hudgins, Carter & Coleman, Alexander, VA, for defendant.

MOTZ, Chief Judge.

Plaintiff Gazette Newspapers, Inc. alleges that defendant New Paper, Inc. violated federal and Maryland laws against trademark infringement and unfair competition when defendant changed the name of the newspaper it operates to "The Frederick Gazette." For the reasons that follow, I conclude that plaintiff is entitled to relief.

I

Findings of Fact

After considering the testimony and documentary evidence offered by both sides, I make the following findings of fact:

1. Current versions of plaintiff's newspapers include: "Aspen Hill Gazette," "Bethesda Gazette," "Burtonsville Gazette," "Chevy Chase Gazette," "Damascus Gazette," "Gaithersburg Gazette," "Germantown Gazette," "Kensington Gazette," "Montgomery Gazette," "Montgomery Village Gazette," "Mt. Airy Gazette," "North Potomac Gazette," "Olney Gazette," "Potomac Gazette," "Poolesville Gazette," "Rockville Gazette," "Silver Spring Gazette" and "Wheaton Gazette."

A

Plaintiff publishes eighteen weekly newspapers in Maryland communities just outside Washington, D.C. Each paper has a name consisting of the name of the community in which the paper is primarily distributed followed by the word "Gazette."[1] Most papers are circulated primarily or exclusively in Montgomery County, Maryland. One paper, the "Mount Airy Gazette," circulates widely both in Montgomery County and in adjacent Frederick County.

Plaintiff's predecessor in interest first began publishing a newspaper under the name "Gazette" in 1959 with the "Gaithersburg Gazette." Over the next thirty-seven years, plaintiff expanded by creating newspapers in other area communities. Most recently, in February, 1996, plaintiff launched the "Wheaton Gazette" and the "Kensington Gazette." In 1982, plaintiff gained a foothold in Frederick County when it purchased a paper in Mt. Airy and renamed it the "Mt. Airy Courier–Gazette." In 1984, it changed the name to "Mt. Airy Gazette." Plaintiff currently distributes more than 270,000 newspapers per week, most through free deliveries to individual residences and some through bulk drops at various locations. Approximately 65 percent of the space in a typical paper is devoted to news, 35 percent to advertising. The papers cover primarily local and regional news. The vast majority of plaintiff's revenue comes from advertising.

Although each of plaintiff's papers uses the name of a community as well as the name "Gazette," plaintiff frequently refers to itself or its publications as "Gazette Newspapers" or simply "Gazette." For example, "Gazette Newspapers" appears on the editorial page of the papers and on special pullout sections. Plaintiff also uses "Gazette Newspapers" in

On the front page of the papers, the name appears in all capital letters (e.g., "BETHESDA GAZETTE"). Depending on the context, plaintiff sometimes capitalizes all the letters in its name and the names of its papers and sometimes only capitalizes the first letter of each word. Defendant follows a similar practice. Because the capitalization does not affect my analysis of the mark in any material way, in this opinion I will capitalize only the first letter of each word for the publications of both parties.

sponsoring charity and community events and on promotional items like t-shirts and coffee mugs. Plaintiff also sponsors a cable television program called "Gazette Newsmakers," which appears on a local access channel in Montgomery County.

Although plaintiff's newspapers circulate mainly in Montgomery County, they are known throughout Frederick County as well.[2] Plaintiff distributes about 4700 copies of its papers a week in Frederick County. Although most of those papers are distributed in the Mount Airy area, a few are distributed in the city of Frederick. Plaintiff also conducts a number of its promotional activities in Frederick County.

Others in Frederick County have been exposed to plaintiff's newspapers as a result of the close economic and social relationship between Frederick County and Montgomery County. Approximately 32,000 Frederick County residents—nearly a quarter of the county's workforce—commute to work into Montgomery County. Approximately 22,000 people moved into Frederick County from Montgomery County between 1980 and 1990. Many others travel from Frederick County to Montgomery County to shop or visit. Because plaintiff's papers circulate throughout Montgomery County, these Frederick County residents have had many opportunities to become familiar with the Gazette chain.

The advertising revenue for plaintiff's newspapers demonstrates another aspect of the close relationship. Over the past three years, plaintiff's eighteen papers have received approximately $1 million a year in advertising revenue from approximately 1000 Frederick County businesses and other sources.[3] Of that $1 million, about 30 percent comes from the Mt. Airy area. After Mt. Airy, the city of Frederick contains the single largest concentration of advertisers in Frederick County.

In recent months, plaintiff has actively explored the possibility of creating a "Frederick Gazette." In February, 1996, Charles A. Lyons, president of Gazette Newspapers, asked Maury Hassett, a longtime employee, to investigate expansion of the Gazette chain into additional communities in Frederick County. In April, 1996, Hassett recommended creation of a paper called the "Frederick Gazette" with a target date for the first issue in September or October, 1996.

## B

Defendant has published a newspaper in Frederick County for the past eight years. Until May 1, 1996, that publication used the name "The New Paper."

The New Paper distributes about 25,000 newspapers in Frederick County, mainly in or near the city of Frederick. Like the Gazettes, The New Paper is delivered through free deliveries to individual residences and bulk drops at locations like offices, stores and restaurants.

On more than one occasion, The New Paper's publisher, William Lafferman, has expressed interest in joining forces with the Gazette chain. On November 9, 1995, Lafferman wrote to Donald Graham, president of the Washington Post Co., which owns the Gazette chain, to tout the benefits of a business relationship. In that letter Lafferman noted that "Northern Montgomery County ... and Frederick are in many respects one community. A large percentage of Frederick's workforce commutes to Montgomery County. Likewise, Frederick County acts as Montgomery County's rural playground." On November 28, 1995, Lyons, the president of Gazette Newspapers, responded in a letter to Lafferman. Lyons wrote that "[w]hile long-term the Frederick market looks very attractive," the Gazette chain was not interested in joining forces with The New Paper.

In its March 27, 1996, edition, The New Paper told its readers that it intended to change its name and was soliciting suggestions. A column authored by Lafferman

2. Frederick County is located just to the northwest of Montgomery County, farther away from Washington, D.C. The largest town in Frederick County is Frederick City, which is approximately 10 miles from the Montgomery County border. In January, 1996, the population of Frederick County was approximately 180,000, of whom close to 50,000 lived in Frederick City.

3. Plaintiff's annual advertising revenues total approximately $17.5 million.

said, "We'll change the name to whatever the majority opinion says it should be. Or if someone comes up with a real gem of a name, we'll go with that." The paper received about 60 responses, many of which included multiple suggestions. Five responses included the suggestion of "Frederick Gazette," one suggested "The Lafferman Gazette," and one suggested "Clustered Spires Gazette" [sic]. Depending on how the numbers were tabulated, "Gazette" finished either second or third among the responses. In the May 1, 1996, edition—the issue in which the paper first appeared as "The Frederick Gazette"—a column written by Lafferman indicated that "Gazette" finished third, behind "The Other Paper" and a category that included names associated with Frederick landmarks and historic figures.

Lafferman has testified that he was seeking a more traditional newspaper name. Although he has conceded that any of number of names, such as "Chronicle," "News" or "Tribune," would have served his legitimate purposes, he selected the name "The Frederick Gazette." Shortly after making his decision, Lafferman spoke with Karl Spain, who owns an eighteen percent share of The New Paper, Inc. and Ryan Phillips, whose wife owns a fifty-one percent share. Spain and Phillips also are, respectively, president and the chief executive officer of The Journal Newspapers, a rival of Gazette Newspapers. Lafferman told them about his decision to rename the paper "The Frederick Gazette." At that time, one or both told Lafferman that the move might precipitate a conflict with the Gazette chain.

On April 30, 1996, the day before the first issue of "The Frederick Gazette" was to appear, Lafferman spoke to Lyons on the telephone. According to Lafferman, Lyons told him that the Gazette Newspapers had recently become interested in entering into a business relationship with Lafferman's newspaper. Whether or not Lyons expressed such an interest, Lafferman has conceded that he did not mention the imminent name change.

On May 1, 1996, the day the first issue of "The Frederick Gazette" appeared, Lyons learned of the name change and called Lafferman to tell him that plaintiff was considering legal action. Lafferman told Lyons that one solution to the conflict was for the Gazette chain to purchase Lafferman's paper. In a subsequent conversation, Lafferman told Lyons that he would not remove the word "Gazette" from the name of the paper.

In sum, Lafferman's actions demonstrated a lack of good faith. He knew or should have known that changing his publication's name to "The Frederick Gazette" would be harmful to plaintiff. He chose that name even though many others would have served his legitimate purposes equally well. Finally, he withheld information about the name change from Lyons.

II

Conclusions of Law

Plaintiff has alleged unfair competition in violation of 15 U.S.C. § 1125(a) (§ 43(a) of the Lanham Act), trademark dilution in violation of 15 U.S.C. § 1125(c) (§ 43(c) of the Lanham Act), and trademark infringement and unfair competition in violation of Maryland common law. Plaintiff seeks an injunction, damages and attorneys' fees.

A

The Lanham Act, 15 U.S.C. § 1125(a) and § 1125(c), protects certain unregistered trademarks from misappropriation. Marks are generally classified into five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68, 112 S.Ct. 2753, 2756–57, 120 L.Ed.2d 615 (1992) (citing Judge Friendly's classic formulation in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)). A generic term does not receive trademark protection. A descriptive term may become a protectable trademark if and only if it has developed a "secondary meaning" in the relevant community. Suggestive, arbitrary and fanciful terms all are entitled to protection without a showing of secondary meaning. *Two Pesos*, 505 U.S. at 768–69, 112 S.Ct. at 2757–58.

Defendant argues that "Gazette" is generic, while plaintiff contends that it is descriptive. I conclude that "Gazette" is descriptive and that plaintiff has demonstrated the secondary meaning necessary to entitle it to protection.

■ "A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species." *Abercrombie & Fitch*, 537 F.2d at 9. A generic term is "the common descriptive name for a thing." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir.1990). A "descriptive" term by comparison "is one that merely describes the ingredients, qualities, or characteristics of an article of trade or a service." *Mil–Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1157 (7th Cir.1996).[4]

■ Courts have struggled with the distinction between generic and descriptive marks. The difficulty is enhanced in this case because the term "Gazette" does not fit neatly into either category. It is not "the common descriptive name" for the product, which is a "newspaper," not a "gazette." A customer at a newsstand might ask for a "newspaper" or a "paper," but probably not a "gazette"—unless the customer is seeking a specific newspaper like the "Bethesda Gazette." Dictionary definitions tend to support this interpretation. According to Webster's Third New International Dictionary, the primary definition of "gazette" is: "a news sheet published periodically: NEWSPAPER—used chiefly in the names of newspapers."[5] The definition of "newspaper," however, does not use the word "gazette." Webster's at 1524. In other words, "gazette"

is not quite a synonym of "newspaper." It is a word used primarily to identify a particular newspaper as part of that paper's name.

On the other hand, "Gazette" is not a classic descriptive term. In *Abercrombie & Fitch*, Judge Friendly cited, as an example of a descriptive mark, the case of "Deep Bowl Spoon," in which "Deep Bowl" describes certain characteristics of "Spoon." 537 F.2d at 10 n. 11. The term "Gazette," in contrast, says little if anything about the characteristics or qualities of the newspaper.

The policies underlying the classifications, however, indicate that "Gazette" should be considered descriptive. Generic terms are not protected under trademark laws because "no matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name." *Id.* at 9. To allow a company to trademark a generic word "would make it difficult for competitors to market their own brands of the same product." *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 609 (7th Cir.1986). Here, plaintiff is not depriving defendant of the right to call its product by its name, a "newspaper." Nor is plaintiff preventing defendant from marketing its product. As discussed above, dozens of traditional newspaper names would have served defendant's legitimate purposes as well as "Gazette."

Factually similar cases support a conclusion that "Gazette" is descriptive. "Courts have been reluctant to find a magazine title generic …" *CES Publishing Corp. v. St.*

---

4. Before 1989, Sections 14 and 15 of the Lanham Act used the phrase "common descriptive name" to denote a generic name of a product. This phrase created some semantic confusion over the years because of the difficulty in distinguishing "common descriptive" marks from "merely descriptive" marks. Accordingly, in 1989 the Trademark Revision Act replaced the phrase "common descriptive name" with "generic name." 15 U.S.C. § 1064, 1065. Courts have consistently treated generic names and common descriptive names as comprising the same category—namely, marks that are not protectable as trademarks even if they have acquired secondary meaning.

5. The full definition of "gazette" is as follows:

1. a news sheet published periodically: NEWSPAPER—used chiefly in the names of newspapers; 2. an official journal published at regular intervals (as twice a week in London and Edinburgh) containing records of various official acts, lists of promotions and honors, names of bankrupts, and public notices; 3. Brit: an announcement in an official gazette (just saw the ~ of his appointment).

Webster's Third New International Dictionary 942 (1981).

*Regis Publications, Inc.*, 531 F.2d 11, 14 (2d Cir.1975) (Friendly, J.). "[U]nlike most goods, whose appearance will convey their nature, periodicals must depend principally on their titles to convey their character." *Id.* at 14. *See also Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1220–21 (2d Cir.1987) (affirming where the district court had concluded, without objection, that "Marketing Week" was descriptive); *Salt Water Sportsman, Inc. v. B.A.S.S., Inc.*, 1987 WL 12552 1987 U.S. Dist. LEXIS 5249 (D.Mass.1987) (holding that "Salt Water Sportsman" was descriptive). The few cases in which courts have held periodical titles to be generic have tended to be cases of trade journals. *See, e.g., Technical Publishing Co. v. Lebhar–Friedman, Inc.*, 729 F.2d 1136 (7th Cir.1984); *CES Publishing Corp., supra.*

Defendant argues that marks bearing the name "Gazette," when registered with the United States Patent Trademark Office (PTO), often include a disclaimer as to any exclusive right to use "Gazette" separately. As plaintiff points out, however, the PTO also has registered marks bearing the name "Gazette" even without requiring a disclaimer. Furthermore, 15 U.S.C. § 1056(b) (Lanham Act, § 6(b)) provides that "[n]o disclaimer ... shall prejudice or affect the applicant's or registrant's rights then existing or thereafter arising in the disclaimed manner...." Accordingly, the registrations to which defendant points establishes neither that "Gazette" necessarily could be not registered, nor that it is a generic mark.

### B

As a descriptive mark, "Gazette" is entitled to protection if it has acquired "secondary meaning" among consumers in the defendant's trade area. *Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757–58; *Maryland Stadium Authority v. Becker*, 806 F.Supp. 1236, 1241 (D.Md.1992), *aff'd*, 36 F.3d 1093 (1994). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Two Pesos*, 505 U.S. at 766 n. 4, 112 S.Ct. at

2756 n. 4. In this case, plaintiff must show that the word "Gazette," when coupled with the name of a community like "Frederick," identifies a newspaper as being part of the Gazette Newspapers chain. The relevant market is that covered by "The Frederick Gazette"—namely, readers and advertisers in Frederick County, especially those in the city of Frederick.

As discussed above, plaintiff's newspapers have gained a reputation in Frederick County. Plaintiff distributes about 4700 copies of its papers each week in Frederick County and conducts promotional activities in Frederick County. Furthermore, as Lafferman himself stated in his letter to Graham, the two counties are in many respects one community, and their economies are closely intertwined. Tens of thousands of Frederick County residents either commute into Montgomery County or formerly lived in Montgomery County, and many others travel from one county to another to shop or visit. Clearly, many have become familiar with the Gazettes and the type and quality of the newspapers produced by the Gazette chain.

Perhaps more importantly, advertisers in Frederick County have come to associate the name "Gazette" with plaintiff's papers. Plaintiff's papers receive approximately $1 million per year in advertising revenue from businesses and other sources in Frederick County. As will be discussed below, at least some of those advertisers have indicated confusion over defendant's name change. That confusion is evidence of the reputation the Gazette chain has established in Frederick County.

Plaintiff has enhanced this reputation by promoting its newspapers as a chain, rather than just as unrelated individual publications. Plaintiff frequently refers to itself as "Gazette Newspapers" in its papers and promotional activities. Furthermore, an area resident or business-person is likely to gain exposure to several different "Gazettes" simply because the papers are so widespread and because the name of each includes the word "Gazette." The natural assumption upon seeing so many similar "Gazettes" in a concentrated area would be that they come from the same source. Finally, the long

history of "Gazettes" in the area—plaintiff's predecessor in interest first began publishing a "Gazette" in 1957—bolsters the meaning of the name.

This reputation exists in the city of Frederick, where defendant's paper primarily circulates, as well as the rest of the county. The city of Frederick is approximately ten miles from the Montgomery County border and its residents have had many opportunities to become familiar with the Gazette chain. Likewise, a significant portion of plaintiff's advertisers from Frederick County are located in the city of Frederick.

Defendant argues that a number of other newspapers bearing the name "Gazette" circulate in the Washington, D.C., area. None of those newspapers, however, circulate in an area so closely linked to the market of plaintiff's papers.

· Because readers and advertisers have come to identify "Gazette" newspapers with the plaintiff's chain of papers, I conclude that plaintiff has established secondary meaning and therefore is entitled to protection under the Lanham Act.

### C

 In addition to showing that a trademark is protectable, a plaintiff must also show that the defendant's use of a colorable imitation of the mark is "likely to cause confusion." 15 U.S.C. § 1125(a)(1)(A). To determine whether a likelihood of confusion exists, courts consider the following factors:

(1) the strength or distinctiveness of the mark;

(2) the similarity of the two marks;

(3) the similarity of the goods/services the marks identify;

(4) the similarity of the facilities the two parties use in their businesses;

(5) the similarity of the advertising used by the two parties;

(6) the defendant's intent;

(7) actual confusion.

*Lone Star Steakhouse & Saloon v. Alpha of Virginia,* 43 F.3d 922, 933 (4th Cir.1995); *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984). "Importantly, not all of these factors are of equal relevance in every case." *Lone Star,* 43 F.3d at 933. After consideration of these factors, I conclude that plaintiff has shown a likelihood of confusion.

*(1) The strength or distinctiveness of the mark*

· As discussed above, "Gazette" is a descriptive mark with secondary meaning among Frederick County residents and advertisers. It is distinctive enough that the public could be confused by an infringement.

*(2) The similarity of the two marks*

Although the appearance of the two marks on their respective papers is slightly different, they are otherwise virtually identical. Defendant uses the mark in the same manner as does plaintiff—namely, as a single word after the name of a community. The fact that none of plaintiff's papers is currently called the "Frederick Gazette" does not eliminate the likelihood of confusion. Plaintiff is known as a chain of newspapers, all of which carry a name like the "Bethesda Gazette." Were plaintiff to expand into the city of Frederick, a person would expect the new paper to be called the "Frederick Gazette." Indeed, in internal discussions about the possibility of such an expansion, plaintiff's employee Maury Hassett referred to the prospective paper as the "Frederick Gazette."

*(3) The similarity of the goods/services the marks identify*

Although by no means identical in format, content or appearance, the newspapers are relatively similar. Both products are weekly tabloid newspapers with a local news and advertising focus.

The papers contain some differences. Defendant's paper devotes more space to arts and entertainment than do plaintiff's papers. Defendant's front page is primarily graphic, with a large drawing; no articles or pictures appear on page one. Plaintiff's papers, in contrast, appear more like traditional newspapers, with news stories and pictures on page one. "The proper inquiry is not whether a reasonable consumer could distinguish the two [publications] when they are dis-

played side to side, but whether having become aware of one of the [publications] on one occasion, he will be able to recognize the difference if presented with the other at a later date." *American Ass'n for Advancement of Science v. Hearst Corp.,* 498 F.Supp. 244, 259 (D.D.C.1980). In that light, the newspapers bear enough similarities to make confusion possible, if not likely.

### (4) The similarity of the facilities the two parties use in their businesses

Because the facilities used by the parties are generally not seen by the public, this factor is of less significance than others. What knowledge the general public has of the papers' facilities comes largely through their distribution systems, which are similar. Both the plaintiff's and the defendant's papers are distributed primarily free of charge, both door to door and at various business locations.

### (5) The similarity of the advertising used by the two parties

Because neither party engages in much traditional advertising, this factor is also of relatively minor significance. The papers, however, engage in similar types of promotional activities, such as sponsorship of community and charitable activities.

### (6) The defendant's intent

"If there is intent to confuse the public, this is strong evidence establishing likelihood of confusion...." *Pizzeria Uno,* 747 F.2d at 1535. I have found that defendant's publisher, William Lafferman, acted in bad faith. In spite of the existence of many other suitable names, he chose one that was likely to confuse readers and advertisers. His claim that he relied on the results of the reader poll is not convincing in light of the fact that only five people suggested "The Frederick Gazette." It strains credibility to contend that Lafferman could have based such an important decision on so few suggestions. Furthermore, more readers suggested a name

with the word "Paper" than a name with "Gazette." Were Lafferman serious about abiding by his readers' wishes, he could have called the publication, for example, "The Frederick Paper."

Lafferman has demonstrated a strong interest in being purchased by plaintiff or another publication. Whether or not his ultimate goal was to convince plaintiff to buy him out, the evidence convinces me that Lafferman's immediate intent was to create confusion among readers and advertisers.

### (7) Actual confusion

Through affidavits and testimony, plaintiff has demonstrated that a number of people were actually confused by the name change. Hassett, for example, testified that during the first two weeks of May, 1996, at least 15 people called to ask him about the relationship of "The Frederick Gazette" to the Gazette chain. Other evidence indicates that several people have called the offices of Gazette Newspapers to inquire about advertising in "The Frederick Gazette" and that at least one told "The Frederick Gazette" of her confusion. Although the evidence of actual confusion is anecdotal, it is significant enough to provide a further indication of a likelihood of confusion.

Considered together, the relevant factors indicate a strong likelihood of confusion. A person familiar with the Gazette chain, upon seeing "The Frederick Gazette" for the first time, would be likely to assume that "The Frederick Gazette" is part of the chain. Accordingly, plaintiff is entitled to relief under 15 U.S.C. § 1125(a) (§ 43(a) of the Lanham Act).

█ Plaintiff has also sought relief under 15 U.S.C. § 1125(c) (§ 43(c) of the Lanham Act), which provides a cause of action for dilution of famous marks. The factors to be considered under that subsection are in large part the same factors I have already considered in evaluating plaintiff's claim for trademark infringement under § 1125(a).[6] Likeli-

---

**6.** To determine whether trademark dilution has occurred: a court may consider factors such as, but not limited to—

(A) the degree of inherent or acquired distinctiveness of the mark;

hood of confusion, however, need not be shown to prove trademark dilution. *See* U.S.C. § 1127 (defining "dilution" as "lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of ... likelihood of confusion, mistake, or deception"); *Dr. Seuss Enterprises, L.P. v. Penguin Book USA, Inc.*, 924 F.Supp. 1559, 1573 (S.D.Cal.1996). Thus, for the reasons discussed above, plaintiff is also entitled to relief under § 1125(c).

The conclusions that I have reached also entitle plaintiff to recover under Maryland common law. *See Perini*, 915 F.2d at 125 n. 3 (legal framework for trademark infringement under Maryland law is identical to that under federal law); *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594, 597 (4th Cir.) (same), *cert. denied*, 506 U.S. 862, 113 S.Ct. 181, 121 L.Ed.2d 126 (1992).[7]

### III

### Remedies

■ Defendant's violation of § 1125(a) entitles plaintiff to injunctive relief pursuant to 15 U.S.C. § 1116. Defendant argues that a court should not grant injunctive relief where the complaining party has not actually "penetrated" into the area in which the defendant operates. *Pizzeria Uno*, 747 F.2d at 1536. Plaintiff has, however, penetrated defendant's operating area, particularly with regard to advertising. Furthermore, trademark rights apply both to where the mark is actually used and "to the area of probable expansion." *Spartan Food Systems, Inc. v. HFS Corp.*, 813 F.2d 1279, 1282 (4th Cir. 1987). Plaintiff has demonstrated the likeli-

hood of its future expansion further into Frederick County and the city of Frederick.

The parties have previously agreed that, if this Court were to rule for plaintiff, defendant would have two weeks from the date of this opinion to cease using the name "The Frederick Gazette." Accordingly, defendant is enjoined from in any way using the name "The Frederick Gazette" or any similarly confusing name, effective two weeks from the date of this opinion.

■ Plaintiff has requested that defendant be required to surrender all infringing articles to plaintiff for destruction pursuant to 15 U.S.C. § 1118, which states that the court "may" grant such relief. Such a remedy does not appear necessary at this time in light of the injunction against defendant's future use of the name "The Frederick Gazette." *See Kelley Blue Book v. Car–Smarts, Inc.*, 802 F.Supp. 278, 293 (C.D.Cal.1992) (exercising discretion not to require destruction where court had enjoined further infringement); *Neva, Inc. v. Christian Duplications Intern., Inc.*, 743 F.Supp. 1533, 1549 (M.D.Fla.1990) (same).

■ Plaintiff is also entitled to actual damages to the extent of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Plaintiff has not alleged that defendant profited from the name change and is not seeking damages for that item. Plaintiff has contended, however, that to alleviate the confusion caused by defendant, plaintiff will need to place four full-page advertisements in the daily newspaper in the city of Frederick. Those advertise-

---

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1).

7. Plaintiff also argues that, even if this Court were to determine that the word "Gazette" is generic, the principles of Maryland unfair competition law would still entitle it to relief. *See Trimed, Inc. v. Sherwood Medical Co.*, 977 F.2d 885, 891 (4th Cir.1992) (laying out elements of unfair competition). Because this Court has determined that the mark is descriptive and has secondary meaning, it need not decide that question.

ments will cost $2,500 apiece. I find that request to be reasonable under the circumstances and accordingly will award $10,000 in damages for that purpose. Plaintiff also contends that it will need to increase its promotional activities in Frederick County, at a cost of $10,000, to restore its reputation. Plaintiff has not offered any evidence of damage to its reputation or of how increased promotional activities would alleviate the confusion created by defendant. Accordingly, I will not award damages to account for increased promotional expenses.

■ Under § 1117(a) this court, in assessing damages, "may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." Plaintiff has requested that its actual damages be trebled in accordance with that provision. Because I have found that defendant acted intentionally to infringe on plaintiff's trademark, I will double the actual damages and hereby award damages to plaintiff of $20,000. Plaintiff also is entitled to recover the costs of this action.

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). In light of the doubling of damages and the totality of the circumstances, I decline to award fees in this case.

### IV

A separate order effecting the rulings made in this opinion is being entered herewith.

### ORDER

For the reasons stated in the opinion entered herein, it is this 2nd day of July, 1996,

ORDERED:

1. Defendant is permanently enjoined from in any way using the name "The Frederick Gazette" or any similarly confusing name, effective two weeks from the date of this order;

2. Defendant shall pay to plaintiff damages of $20,000.00, plus costs;

3. Judgment is entered for plaintiff against defendant.